23041

TIGER, INC., and Green Apple Land, Inc., as general partners of Green Apple Partnership, a South Carolina Limited Partnership, and Green Apple Partnership, A South Carolina Limited Partnership, in its sole capacity and as co-venturer of Granny Peach Associates, a Joint Venture, Appellants v. FISHER AGRO, INC., in its individual capacity and as co-venturer of Granny Peach Associates, a Joint Venture; FBI Foods, Ltd., a Canadian Corporation; Fisher Bros. Sales, Inc.; et al. Of Whom Fisher Agro, Inc., FBI Foods, Ltd. and Fisher Bros. Sales, Inc. are Respondents, and TIGER, INC., and Green Apple Land, Inc., as general partners of Green Apple Partnership, a South Carolina Limited Partnership, and Green Apple Partnership, A South Carolina Limited Partnership, in its sole capacity and as co-venturer of Granny Apple Associates, a Joint Venture, Appellants, v. FISHER AGRO, INC., in its individual capacity and as co-venturer of Granny Apple Associates, a Joint Venture; FBI Foods, Ltd., a Canadian Corporation; Fisher Bros. Sales, Inc.; et al. Of Whom Fisher Agro, Inc., FBI Foods, Ltd. and Fisher Bros. Sales, Inc. are Respondents.

(391 S.E. (2d) 538)

Supreme Court

*Charles Porter, E. Russell Jeter, Jr.,* and *T. Parkin Hunter,* all of *McNair Law Firm,* Columbia, *for appellants.*

*R. Frank Plaxco* and *Jack H. Tedards, Jr.,* both of *Leatherwood, Walker, Todd & Mann,* Greenville; and *Horace C. Smith,* of *Whiteside, Smith, Jones & Duncan,* Spartanburg, *for respondents.*

Heard April 18, 1989.

Decided June 26, 1989.

HARWELL, Judge:

This case involves a complaint for judicial dissolution of a joint venture and for resolution of additional matters related to the venture. We affirm.

## FACTS

In 1980, Arthur Fisher[1] of Canada began to investigate the feasibility of growing the increasingly popular "Granny Smith" apple in the United States. Toward that end, he entered into discussions with Pierre LaCharlotte of France, who is also in the fruit business. The parties hired an expert on green apples, along with a topsoil expert, who together determined that the climate and soil conditions of the South Carolina upstate would provide an excellent environment for growing the apples. LaCharlotte then approached a friend, Muhammad Abu Gazaleh, of Lebanon, who agreed to invest in the project.

In 1982 the joint venture, "Granny Apple Associates," was formed. There were two partners to the venture: 1) "FBI Foods, Ltd.," formed solely to operate as Arthur Fisher's venturer; and 2) "Green Apple Partnership." Green Apple Partnership was originally composed of Ahmed Abu Gazaleh and Sons Co. Ltd. (Abu Ghazaleh), as a limited partner, and

---

[1] Arthur Fisher is the owner of Respondent FBI Foods, Ltd., of which Respondent Fisher Bros. Sales and Respondent Fisher-Agro are subsidiaries.

"Green Apple Land," as the general partner. Green Apple Land is a South Carolina corporation whose stock is owned indirectly through holding companies represented by a Swiss attorney on behalf of undisclosed European investors. The president of Green Apple Land is Stephen Brown, a Tennessee attorney.

Granny Apple Associates purchased land and planted the first apple trees in late 1982. Sometime in 1983, a decision was made to expand the business and a peach farm, already in operation was purchased. A portion of the peach farm was to be used for growing apples. At this time, the partners formed a second venture, "Granny Peach Associates." They also re-stated the Granny Apple Associates venture agreement.[2] Abu Ghazaleh, the limited partner, decided to become a general partner in the ventures, and formed Tiger, Inc., for this purpose. A new limited partner, Falcon, Inc., also invested during the 1983 expansion.

According to the joint venture agreements, the operations were to be handled as follows: Green Apple Partnership was to supervise the day to day administrative activities of the ventures; LaCharlotte was to provide technical assistance on the farms;[3] and FBI Foods, Ltd. (FBI), owned by Fisher, was exclusively responsible for marketing the fruit in accordance with a separately stated marketing agreement referenced in the venture agreements. The profits from the ventures were to be split 79% to Green Apple Partnership and 21% to Fisher-Agro.

In 1983, there was no peach crop because of a freeze. In 1983 and 1984, there was no apple crop because the trees were too young to yield fruit. There was, however, a 1984 peach crop to market. Subsequent to the completion of the peach crop marketing by FBI the parties expressed some dissatisfaction with the results of the season. The minutes of the management committee meeting of November 18, 1984

---

[2] The parties to Granny Peach are Green Apple and Fisher-Agro. The parties to Granny Apple, under the re-stated agreement, became Granny Apple and FBI Foods, Ltd. FBI Foods, Ltd. later assigned its interest to Fisher-Agro.

[3] LaCharlotte's involvement was in his capacity as an employee of SICA, USA, the consulting group retained by the ventures to provide, according to the venture agreements, "technical expertise, consulting services and know-how in orchard growth, development and management for the farm."

indicated, however, that the average price received was "comparable to those of other growers in [the] area."

In 1985, just prior to the harvesting of the first apple crop, a dispute arose between Abu Ghazaleh and Fisher over an unrelated business deal. Because this dispute was not related to the ventures, the Master refused to consider its merits, although he did allow introduction of evidence that the dispute existed. The evidence showed that sometime after the formation of Granny Apple Associates, FBI entered into an agreement with United Trading Company (UTC), owned by Muhammed Abu Ghazaleh, related to the distribution of Chilean fruit. UTC, an exporter of Chilean fruit, was to provide FBI with fruit to market. A disagreement over FBI's marketing techniques arose between Abu Ghazaleh and FBI. FBI alleges that UTC refused to abide by its agreement, resulting in Fisher, through FBI, filing a lawsuit against UTC in New York. As of the filing of this appeal, that litigation was still pending.

In September of 1985, Abu Ghazaleh attempted to completely sever relationships with Fisher related to the South Carolina ventures. Buy-Sell negotiations were entered into, but were unsuccessful.

The first apple crop yield, in the fall of 1985, was only approximately 1,500-1,600 boxes (two truck loads) and was shipped to wholesalers in Atlanta and Birmingham for sale on consignment. There was no 1985 peach crop because of a freeze.

Appellants expressed dissatisfaction with FBI's marketing of this 1985 apple crop, specifically claiming that it contravened the marketing agreement by delivering to wholesalers for sale "on consignment," and failing to remit timely the sales proceeds. Allegations of impropriety were also raised at this time concerning the previous 1984 peach crop marketing. On January 13, 1986, Green Apple Partnership sent notice to FBI that the Granny Apple marketing agreement was being terminated for material breach. FBI responded, denying the breach.

The 1986 apple crop was ready for packing. FBI advised the farm of the packing standard to be followed. Boxes packed pursuant to this standard were sold to chain stores, the most desirable market for fruit, for approximately $14.94 per

box. After these initial sales, the farm personnel, without consulting FBI, lowered the packing standard because the higher standard had resulted in a large number of culls.[4] Fruit packed under the lower standard was rejected by the chain stores. Thereafter, the apples packed under the lower standard were sold on consignment at prices ranging from $3.00 to $8.25 per box. Appellants allege these marketing techniques, particularly the consignment sales, constituted a further breach of the marketing agreement.

In June of 1986, the current litigation was commenced. By this time, FBI had assigned its rights under the marketing agreement to Fisher-Agro. Thereafter, Appellants refused to allow Fisher-Agro to market the 1986 peach crop. The peach crop was marketed by "Cal-Fruit Suma," a company partly owned by Tiger, Inc. Fisher-Agro sought and was granted a temporary injunction preventing appellants from interfering with marketing the 1986 crop.

Tiger, Inc., Green Apple Land, and Green Apple Partnership instituted two separate actions for dissolution of the ventures and for resolution of related matters. The two actions were consolidated for trial before the Master-in-Equity with stipulation that appeal would be directly to this Court.

Prior to trial, the parties voluntarily agreed to discontinue and liquidate the peach operations of Granny Peach Associates. The only issues remaining in the Granny Peach Associates litigation were (1) a claim for damages related to an alleged breach of the marketing contract at the beginning of the 1986 season; and (2) issues relating to the apple operations of Granny Peach Associates, substantially the same as those relating to the operations of Granny Apple Associates. The Master refused to dissolve the ventures and found that Fisher had not violated the marketing agreements. This appeal follows.

## DISCUSSION

### I. MARKETING AGREEMENT

Appellants argue that the Master erred in finding that FBI had not breached the marketing agreement. Appellants' two

---

[4] "Culls" are fruits rejected because of their inferior quality.

main areas of contention with regard to the marketing agreement center around the use of the consignment method of sales and the sale of fruit to a division of FBI known as the "Terminal Division."

Both joint venture agreements provide the following with regard to FBI's marketing responsibilities:

> The Joint Venture shall exclusively market the produce from the Farm through a distribution agreement with FBI of [sic] any of its affiliates in the form of schedule "C"[5] hereto. FBI's commission for the sale of produce from the farm will be seven and one-half (7½%) percent of FBI's gross sales price to its customers for the produce from the farm. If FBI defaults under this Joint Venture Agreement, the distribution will no longer be exclusive and may be terminated by Green Apple.

The distribution agreement (schedule "C") provides, with regard to the manner of sales, that "FBI will use its best efforts to distribute and sell . . ." There are no provisions in the agreement which prohibit sales on consignment or sales to FBI Terminal Division.

## A. CONSIGNMENT SALES

Appellants contend that FBI's use of the consignment method violated the marketing agreement and the regulations under the Perishable Agricultural Commodities Act (PACA) specifically, 7 C.F.R. 46.30 and 46.32 (1988). The Master found that FBI, as a "grower's agent," was not prohibited from making consignment sales. We agree.

A "growers' agent" is defined as "any person operating at shipping point who sells or distributes produce in commerce for or on behalf of growers or others and whose operations may include the planting, harvesting, grading, packing, and furnishing containers, supplies or other services." 7 C.F.R. § 46.2(q). FBI falls within this definition.

With regard to the operations of growers' agents, 7 C.F.R. § 46.30(b) provides that "some [growers] agents are limited by contract to making only sales and cannot . . . consign

---

[5] The peach venture agreement referred to this as schedule "D."

produce without obtaining the prior consent of the growers. Other agents are granted blanket authority by the growers to market and distribute the produce, using their discretion as to the best methods, depending on marketing conditions and the quality of produce available. They can sell, consign, or ship on joint account . . ."

The distribution agreement in this case does not contain any prohibition against consignment sales. FBI, as a grower's agent, not prohibited by contract, had blanket authority under the "best efforts" clause to utilize the consignment method.

Appellants further contend that FBI breached the marketing agreement and failed to abide by PACA regulations in failing to timely account for and remit proceeds of consignment sales. Fisher conceded at trial that a misunderstanding had resulted in delayed accounting. This occurred only over a short period of time. The record supports the Master's finding that the delayed accounting was not intentional and did not rise to a level sufficient to constitute a material breach.

## B. SALES TO TERMINAL DIVISION OF FBI FOODS, LTD.

FBI has two divisions, a Terminal Division and an International Division. In 1984 and 1986, FBI made sales of a portion of the peach crops to the Terminal Division of FBI. At the time these sales were made, Green Apple Land did not object. LaCharlotte testified that he was aware of these sales.

Appellants contend that FBI sold peaches to its own Terminal Division at lower prices than to other buyers, thus engaging in self-dealing. However, appellants' evidence showed only a few instances where the same brand of peach was sold to Terminal Division and another purchaser on the same date. On these instances, with two exceptions, Terminal either paid more, or the same, as other purchasers. With regard to these two exceptions, the Master found that appellant failed to establish that the lower prices were not warranted, either because of market conditions or on account

of quality. We agree. From our review of the evidence, we see no error in the Master's holding that FBI had not breached the marketing agreement.

## II. DISSOLUTION

### A. DISCORD AND DISSENSION

Appellants contend that the Master erred in refusing to judicially dissolve the ventures on the basis of discord and dissension among the partners. We disagree.

An action seeking dissolution of a partnership is one in equity. *Bettis v. Leavitt*, 236 Ga. 213, 223 S.E. (2d) 88, 91 (1976). *See generally* 68 C.J.S. *Partnership* § 405 (1950 and Supp.). Our scope of review for a case heard by a Master-in-Equity who enters a final judgment is the same as that for review of a case heard by a circuit court without a jury. *Wigfall v. Fobbs*, 295 S.C. 59, 60-61, 367 S.E. (2d) 156, 157 (1988). We may review the evidence to determine facts in accordance with our own view of the preponderance of the evidence. While this permits us a broad scope of review, we do not disregard the findings of the Master, who saw and heard the witnesses and was in a better position to evaluate their credibility. *Duckett v. Payne*, 279 S.C. 94, 96, 302 S.E. (2d) 342, 343 (1983); *Klutts Resort Realty, Inc. v. Down'round Development Corp.*, 268 S.C. 80, 91, 232 S.E. (2d) 20, 26 (1977).

In addressing any question of dissolution, a court must first look to the joint venture agreement between the parties. The agreement here provides that the term of the venture will continue until the "dissolution and termination of the Joint Venture pursuant to Article X." Article X, entitled "Dissolution and Termination of the Joint Venture" provides that the venture shall continue in full force and effect until the happening of one of four events.[6] Appellants concede that none of the above-listed events occurred in this case.

---

[6] The events listed in the agreement were: a) the venturers agree in writing to terminate and dissolve the Joint Venture; b) an event makes it unlawful for the existence of the Joint Venture to be continued; c) the sale or disposition of all or substantially all of the assets of the venture; or d) December 31, 2032.

Relations among joint venturers are governed by partnership law. *Polikoff v. Levy,* 132 Ill. App. (2d) 492, 498, 270 N.E. (2d) 540, 546 (1971). S.C. Code Ann. § 33-41-940 (1976) provides in pertinent part:

(1) On application by or for a partner, the court shall decree a dissolution whenever:

(d) a partner willfully or persistently commits a breach of the partnership agreement or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practical to carry on the business in partnership with him, or

(f) other circumstances render a dissolution equitable.

This language was adopted from the Uniform Partnership Act. Other states interpreting this section have held that these provisions provide for judicial dissolution on the grounds of discord and dissension among the partners. *E.g., Lau v. Wong,* 1 Haw. App. 217, 616 P. (2d) 1031 (Ct. App. 1980); *Owen v. Cohen,* 19 Cal. (2d) 147, 119 P. (2d) 713 (1941); *Steckroth v. Ferguson,* 281 Mich. 279, 274 N.W. 792 (1937). We agree with this interpretation of these provisions.

Judicial dissolution may be appropriate where disagreement between the partners is so severe that "all confidence and cooperation between the parties has been destroyed" or where the behavior of a partner "materially hinders a proper conduct of the partnership business." *Owen v. Cohen,* 19 Cal. (2d) 147, 119 P. (2d) 713, 715 (1941).

> [The] general rule is that gross misconduct, want of good faith, wilful [sic] neglect of partnership obligations, and such other causes are as productive of serious and permanent injury to the partnership or which render it impracticable to carry on the partnership business, are proper grounds for the dissolution of a partnership by a court of equity at the instance of the innocent part, nevertheless a court of equity will not dissolve an existing partnership for trifling causes or temporary grievances involving no permanent mischief.

*Logan v. Logan,* 36 Wash.App. 411, 675 P. (2d) 1242, 1246 (1984) citing *Fuller v. Brough,* 159 Colo. 147, 153, 411 P. (2d) 18, 21 (1966).

The conduct complained of "must be legally substantial and

evidence either gross misconduct or want of good faith, or cause serious and permanent injury to the partnership." *Wood v. Holiday Mobile Home Resorts, Inc.*, 128 Ariz. 274, 625 P. (2d) 337, 343 (Ct. App. 1981). If there is no evidence of substantial misconduct, a partner should not be allowed to defeat the rights of other parties by the "simple expedient of bringing suit." (citations omitted), *Master Garage, Inc. v. Bugdanowitz*, 690 P. (2d) 879, 881 (Colo. App. 1984).

Our review of the law in this area indicates that judicial dissolution of a venture is appropriate only in serious situations.[7] Our examination of the conduct of which appellants complain does not reveal anything which rises to a level sufficient to justify judicial dissolution, particularly in light of these stringent standards.

Appellants allege a number of infractions, most of which center around the methods utilized to market the fruit. We have already determined that these allegations are meritless, therefore they cannot form a valid basis for judicial dissolution. It cannot be ignored that these complaints were not voiced until after the respondent instituted litigation against the appellant on a different matter in New York. We agree with the Master's conclusion that this separate litigation inescapably led to the expressions of dissatisfaction which followed. Aside from the New York matter, there appears to be no significant reason for appellants' discontent. There was testimony at trial and counsel conceded at oral argument that the New York litigation was the "genesis of the discord and dissension" between the parties of the South Carolina ventures. We see no reason to dissolve a going venture because of a totally independent lawsuit between only two of several investors in the large venture.

Abu Ghazaleh was unable, upon cross-examination, to name

---

[7] E.g.: Owen v. Cohen, 19 Cal. (2d) 147, 119 P. (2d) 713 (1941) (partners disagreed on practically all matters central to the operation of the business and adverse impact on the business was apparent); Lau v. Wong, 1 Haw.App. 217, 616 P. (2d) 1031 (Ct. App. 1980) (partner withheld information about the business, failed to call meetings and the business had begun to exist only for his benefit); Ferrick v. Barry, 320 Mass. 217, 68 N. E. 2d 690 (1946) (complete lack of cooperation impacted negatively on the business, on one occasion necessitating that the business close for several days); Steckroth v. Ferguson, 281 Mich. 279, 274 N.W. 792 (1937) (defendant attempted to dominate business, countermanding plaintiff-partner's directions to employees, resulting in chaos).

an area in which respondent had interfered in either the legitimate efforts of the growing and production of the apples, or the administrative operations. The only complaint appears to have been with Fisher's marketing; Abu Ghazaleh could point to no other area of the business in which Fisher had interfered with the carrying out of the venture's business. Stephen Brown, president of Green Apple Land, Inc., agreed with this testimony. Further, LaCharlotte agreed upon cross-examination that Fisher had acted in the best interests of the venture and had not interfered in farm management. The record establishes by a clear preponderance of the evidence that dissolution by reason of discord and dissension was not appropriate.

### B. ECONOMIC NON-VIABILITY

Appellants next argue that dissolution was appropriate because the ventures had proven to be economically non-viable. S.C. Code Ann. § 33-41-940(1)(e) provides that the Court shall decree a dissolution whenever the business of the partnership can only be carried on at a loss. It must be apparent that the venture is unprofitable with no reasonable prospects of success. *Wallace v. Sinclair*, 114 Cal. App. (2d) 220, 250 P. (2d) 154 (1952); Crane and Bromberg, *Law of Partnership* at p. 441 (1968). Appellants must shoulder the burden of proving that the business is being operated at a loss or is, in their words, economically non-viable. Toward that end, appellants presented the expert testimony of Professor Charles Alford, who opined that the apple venture had a "present negative value." In so deciding, Alford used a discount rate of 27% net of inflation. The Master disagreed with the use of such a high rate of return, finding that the investors did not enter into the ventures expecting such a rate of return. Alford also used figures with which the Master disagreed in arriving at his determination. Instead of using actual "pick-pack" costs,[8] Alford used assumed costs which were higher than the actual costs. The

---

[8] "Pick-pack" costs are those costs associated with picking and packing apples and are depicted on a "per box" basis.

Master disagreed with the use of such assumed costs and substituted the actual costs to arrive at a substantial present value of the venture. We find no fault with the calculations of the Master nor with his rejection of appellants' expert's use of the large discount rate. The Master based his calculations on the testimony of respondents' expert, Professor Norman Scarborough, who presented a venture value using actual pick-pack costs and a more realistic discount figure. Upon review of the record, we discern no error in the Master's findings.

Appellants further contend that the ventures will not begin to operate in "the black" until 1990, and that the ventures are not economically healthy because of market conditions. This is a fifty year venture. The evidence shows that difficulties have been encountered by all concerned, leading to an approximate two year delay in yield; however, the evidence establishes that the orchards represent a substantial asset. We agree with the Master's finding that appellants failed to sustain their burden of showing that the venture should be dissolved on the basis of economic non-viability.

## CONCLUSION

Appellants have failed to prove that the Master erred in his Order by refusing to dissolve the partnership and refusing to terminate the marketing agreement. Appellant's remaining exceptions are dismissed pursuant to Supreme Court Rule 23 and under the following authorities: *Laney v. Hefley*, 262 S.C. 54, 202 S.E. (2d) 12 (1974); *McGaha v. Mosley*, 283 S.C. 268, 322 S.E. (2d) 461 (Ct. App. 1984); *Robert E. Lee & Co. v. Commission of Public Works of City of Greenville*, 248 S.C. 92, 149 S.E. (2d) 59 (1966); *Wayne Smith Construction Co., Inc., v. Wolman, Duberstein & Thompson*, 294 S.C. 140, 363 S.E. (2d) 115 (1987).

Affirmed.

GREGORY, C.J., and CHANDLER, FINNEY and TOAL, JJ., concur.