632 S.E.2d 882

**LANDBANK FUND VII, LLC, Respondent,**

v.

**Kent D. DICKERSON, Dickerson & Sons, Inc., and Phoenix Land and Development Company, LLC, Appellants.**

**No. 4111.**

Court of Appeals of South Carolina.

Heard March 7, 2006.

Decided May 8, 2006.

Withdrawn, Substituted and Refiled July 11, 2006.

Rehearing Denied July 11, 2006.

622

C. Mitchell Brown, William C. Wood, Jr., Elizabeth Herlong Campbell, all of Columbia, for Appellants.

J. Jackson Thomas, of Myrtle Beach, for Respondent.

WILLIAMS, J.:

Kent D. Dickerson, Dickerson & Sons, Inc., and Phoenix Land and Development Company, LLC,[1] appeal a decision of the Horry County Master–in–Equity concluding Dickerson was not entitled to additional compensation for certain work performed on behalf of LandBank Fund VII, LLC. We affirm.

## FACTS

In 1995, Joe C. Garrell, a Myrtle Beach resident and licensed realtor, recruited investors from among his family and friends for the purpose of acquiring and reselling a large tract of land in Horry County. The group of investors formed LandBank, LLC, a South Carolina limited liability company, to facilitate the transaction. Garrell received a real estate commission on the land sale and a membership interest in the company for his efforts in forming the entity and acquiring the land.

The initial LandBank transaction proceeded smoothly and was financially beneficial to the company and its members. Accordingly, the transaction was followed by several other purchases, most from the same seller as the initial transaction, International Paper. To facilitate these subsequent purchases, four additional limited liability companies were formed. The companies were ultimately dubbed LandBank II, LandBank Fund III, LandBank Fund IV, and LandBank Fund V. LandBank entities II through V were each concerned

---

1. This appeal and the underlying action involve the employment of Kent D. Dickerson, acting both individually and, in some instances, on behalf of the aforementioned companies. Because the differing roles of Dickerson as both individual and head of these companies are not at issue, this opinion will collectively refer to all appealing entities as "Dickerson" for the remainder of this opinion.

with separate purchases, and the subsequent sale of, different tracts of land, but were virtually identical in membership and operation to the original LandBank, LLC.

In 1999, LandBank Resource Management, LLC, ("LRM") was formed to provide management services to all the Land-Bank entities. According to the respondent, LRM was a board managed entity owning no property. Its function was to manage the LandBank entities, review and consider additional LandBank investor opportunities, and meet the service needs of the various LandBank entities, including the procurement of surveying, engineering, land planning, legal, zoning, utilities, and environmental services. LRM's operational funds came from reimbursements by the other LandBank entities. Though under the direction of the LRM board, Garrell handled the day-to-day management of LRM.

In 2000, Garrell began feeling somewhat overwhelmed by the extent of his LandBank responsibilities and requested that the LRM board allow him to seek professional assistance. In March 2000, Garrell engaged the professional consulting services of Dickerson, a non-practicing attorney from Arizona who was knowledgeable and experienced in the acquisition and marketing of real estate. These services were initially intended to be temporary and Dickerson's agreement with Land-Bank anticipated completion by around September 2000.

LRM was pleased with the initial services provided by Dickerson. In April 2001, Garrell, after again receiving the full consent of the LRM board, entered into a modification of Dickerson's consulting agreement. In addition to the compensation called for in Dickerson's initial agreement, the modification called for a $30,000 "performance based fee" to be paid to Dickerson in appreciation of his prior efforts. The modification also secured Dickerson's future services for an indefinite period of time, terminable upon six months notice by either party. As compensation for his continued non-exclusive services, the modification called for Dickerson to receive $15,000 per month, $2,000 per month in home rental expenses, a sport utility vehicle, cell phone, computer, office, and company credit card. The modification agreement also called for future "transaction/performance-based compensation when justified and agreed to in advance."

In February 2002, Dickerson proposed a venture to the LRM board that was substantially different than LandBank's prior business activities. Dickerson envisioned a "beach club" concept for the benefit of the end purchasers of all the LandBank properties. Because the properties were land-locked, he felt the purchase and development of a beachfront club and restaurant could be used to enhance the marketability of the LandBank properties. The proposed beach club was to be acquired and developed by a separate LandBank entity, LandBank Fund VI. This proposal was different from the previous LandBank entities in that it contemplated continued ownership and operation of a facility, rather than the simple acquisition, marketing, and sale of a tract of undeveloped land.

Dickerson pitched this new business concept to the LRM board on several occasions and submitted an official "summary proposal" in July 2002. Due to the higher risk involved in this sort of business venture, the proposal was not as well received by the LandBank members as prior business opportunities. In order to make LandBank Fund VI a more attractive investment for the members of the previous LandBank enti-ties, the beach club plan (LandBank Fund VI) was coupled with a low-risk investment with a promising possibility of quick profit. Named LandBank Fund VII, LLC, this business proposal was to fit the traditional mold of the LandBank through LandBank V entities. It involved another purchase of a large tract of land from International Paper at $15,000 an acre and a potentially quick resell to homebuilder D.R. Horton for $20,000 an acre. It was understood among the members of the prior LandBank entities that LandBank Fund VI and VII were a "package deal" and membership in the lower risk LandBank Fund VII meant membership in the higher risk LandBank Fund VI. Ultimately, about sixty-five percent of the LandBank members joined LandBank Fund VI and VII.

By September 2002, LandBank Fund VII's purchase of the International Paper ("IP") tract was under contract with Garrell. The sales agreement with IP provided for the assign-ment of Garrell's contract rights to LandBank Fund VII prior to closing. On December 6, 2002, LandBank Fund VII pur-chased the IP property. Due largely to complications con-cerning environmental issues, the desired simultaneous sale to D.R. Horton was delayed.

During several meetings leading up to the purchase of the IP tract, Dickerson did not disclose to the LRM board that, beginning as early as September 2002, he was attempting to obtain a very large "asset placement fee" of three and one-half percent of the total D.R. Horton sales price payable to him by LandBank Fund VII upon closing. According to Dickerson, this fee was openly discussed and fully approved by Garrell as early as the summer of 2002. Richard Lovelace, an attorney for the LandBank entities who performed a substantial amount of work on the LandBank Fund VII transaction, supports Dickerson's claims regarding the fee, at least to the extent that the fee was discussed among Dickerson, Garrell, and himself.

Garrell does not dispute the fact that Dickerson's fee was discussed between them. According to Garrell, however, he made it very clear to Dickerson that he did not have the authority to approve such a large payment and the matter would first have to be approved of by the LRM board. To this end, Garrell entered Dickerson's fee by hand on a draft closing statement just before a meeting between board chairman Lyle Ray King, Dickerson and himself on January 12, 2003. According to both Garrell and King, the fee was unequivocally discussed at this meeting and King told Dickerson in unmistakable terms that the proposed fee was not acceptable and would not be approved by the board.

Dickerson claims that the fee discussions with King were "non-committal" and that he left the meeting believing he still had a binding agreement regarding his additional fee due to his prior discussions with Garrell. Nevertheless, two days after the meeting with King, Dickerson instructed attorney Lovelace's staff to change the signature block on all future proposed contracts with D.R. Horton to reflect that it would be signed on behalf of LandBank Fund VII by "Kent D. Dickerson, its Representative." Dickerson's specific written instructions concerning the signature page included the phrase "No Joe Garrell or Lyle Ray King."

On January 20, 2003, Dickerson signed and delivered (as LandBank Fund VII's "Representative") to D.R. Horton a contract which included the payment of the "asset placement and assignment fee" by LandBank Fund VII to Dickerson.

The negotiations with D.R. Horton concerning the contract's terms were handled exclusively by Dickerson and Lovelace and finalized on January 30, 2003. There is a factual dispute between the parties as to the extent Garrell was kept abreast of these negotiations, including a heated disagreement as to when he first received a draft of the contract including Dickerson's disputed fee. Garrell claims he was kept in the dark as to the specific terms of the contract drafts passing between Dickerson and D.R. Horton.

On February 21, 2003, Dickerson attended a meeting of the LandBank VI and VII Board of Managers. At this meeting, Dickerson discussed the imminent closing of the D.R. Horton transaction and the board reviewed a sales and cash flow analysis for the upcoming sale. Conspicuously absent from this presentation was any mention of the fee sought by Dickerson.

The closing of LandBank Fund VII's sale to D.R. Horton took place on March 13, 2003. According to Garrell, he received a copy of the proposed final contract approximately ten days prior to the closing date.[2] Upon noticing Dickerson's fee was included in this draft, Garrell told Dickerson the fee had not been approved by the board and must be removed from the final closing statement. Nevertheless, Dickerson's desired fee appeared on the closing statement prepared by Lovelace on the day of closing. When Garrell noticed the fee remained in the documents, he struck Dickerson's fee from the closing statement and refused to sign until a new closing statement was prepared that did not call for the payment of Dickerson's "asset placement fee." The revised closing statements were prepared and the LandBank Fund VII sale to D.R. Horton was finalized.

Dickerson continued to claim entitlement to the $373,998 fee in conjunction with the 445–acre land sale to D.R. Horton. LandBank Fund VII filed a complaint on May 2, 2003, seeking a declaratory judgment that Dickerson was not owed the disputed fee. Dickerson counterclaimed, asserting he was entitled to the fee based on breach of contract or, alternatively, in quantum meruit for services provided. The mater was

---

2. There is a factual dispute between the parties as to when Garrell actually received this draft of the "final" contract.

referred by consent to the Horry County Master–in–Equity. By order filed July 14, 2004, the Master–in–Equity granted LandBank Fund VII's requested relief and dismissed Dickerson's counterclaims with prejudice. Dickerson's motion to alter or amend the order was denied. This appeal followed.

## DISCUSSION

### I. Breach of Contract

An action alleging breach of contract is an action at law. *Airfare, Inc. v. Greenville Airport Comm'n*, 249 S.C. 265, 269, 153 S.E.2d 846, 848 (1967); *Foxfire Village, Inc. v. Black & Veatch, Inc.*, 304 S.C. 366, 369, 404 S.E.2d 912, 914 (Ct.App.1991). "In an action at law, an appellate court will correct errors of law but must defer to the trial court's factual findings and affirm unless there is no evidence reasonably supporting those findings." *Crafton v. Brown*, 346 S.C. 347, 351, 550 S.E.2d 904, 905–906 (Ct.App.2001).

In the present case, the Master–in–Equity, after reviewing the evidence presented and considering the testimony and credibility of the witnesses, found that Dickerson "failed to establish by a preponderance of the evidence that there was a meeting of the minds as to the payment of a fee or commission . . . in connection with the sale of land to D.R. Horton." Upon review of the record on appeal, we conclude the Master's finding is supported by the evidence.

The burden of establishing the existence of an oral contract and its terms between Dickerson and LandBank Fund VII rests upon Dickerson. *See Jackson v. Frier*, 146 S.C. 322, 329, 144 S.E. 66, 68 (1928) ("The burden is on a party pleading a fact to prove it.") In order to establish the existence of an oral fee agreement, Dickerson must prove by a preponderance of the evidence that there was a meeting of the minds as to all of the essential and material terms of the alleged agreement. *See Player v. Chandler*, 299 S.C. 101, 104–105, 382 S.E.2d 891, 893–894 (1989).

Despite Dickerson's relative sophistication in business and legal matters, no written agreement to pay the fee signed by LandBank Fund VII was ever obtained (excluding the D.R. Horton contract signed only by Dickerson as a "Representa-

tive" of LandBank Fund VII). Accordingly, the Master was confronted with highly conflicting testimony and evidence concerning the presence or absence of a verbal agreement. Although Garrell does not dispute the fact that he discussed payment of the disputed fee with Dickerson as early as the summer of 2002, he maintains, and the Master–in–Equity agreed, that he made clear to Dickerson any compensation in addition to that called for in his lucrative consulting agreement with LRM could only be obtained with board approval. This understanding between LandBank Fund VII and Dickerson is further bolstered by the testimony of King, the board chairman, concerning the meeting of January 12, 2003, during which King explained to Dickerson the board would not approve such a large payment. Dickerson was aware Garrell first sought and received board approval in every prior dealing concerning his compensation.

Conversely, Dickerson's own evidence and testimony tend to reflect the fluid nature of his alleged "asset placement fee" agreement. In several contract drafts present in the record on appeal, the percentage fee first appears in a document dated January 13, 2003, the day after Dickerson was told of the board's probable denial of the proposed fee. All previous drafts call for either no fee, a fee paid by D.R. Horton, a fee of $2000 per acre, or a fee of an indeterminate amount. The testimony of Lovelace, LandBank Fund VII's attorney, supporting Dickerson's claims goes only as far as to back up that Dickerson's fee was, in fact, discussed among Garrell, Dickerson, and Lovelace. It does not refute Garrell's claims that Dickerson was made well aware of the need for board approval before any agreement concerning additional compensation would be binding on LandBank Fund VII.

If Garrell made clear to Dickerson that any fee agreement was not valid until approved by the board, then clearly no meeting of the minds occurred between Garrell and Dickerson regarding the finality of Dickerson's fee agreement, regardless of Garell's actual or apparent authority to bind LandBank Fund VII. The Master–in–Equity, considering conflicting evidence, determined that Dickerson was, in fact, made aware of the necessity for board approval. Accordingly, he concluded Dickerson failed to carry his burden of proof establishing a binding fee agreement between the parties. Because there is

evidence reasonably supporting his conclusion, we affirm the Master on this basis.[3][4]

## II. Quantum Meruit

Dickerson argues on appeal that the Master–in–Equity erred in dismissing his counterclaim for quantum meruit recovery based on Dickerson's receipt of compensation under his consulting agreement with LRM. We disagree.

An action based on a theory of quantum meruit recovery sounds in equity. *Columbia Wholesale v. Scudder May N.V.*, 312 S.C. 259, 261, 440 S.E.2d 129, 130 (1994). When reviewing an action in equity, an appellate court "reviews the evidence to determine facts in accordance with [its] own view of the preponderance of the evidence." *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989).

In order to establish a valid claim for recovery in quantum meruit, the plaintiff must establish "(1) benefit conferred by [the] plaintiff upon the defendant; (2) realization of that benefit by the defendant; and *(3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying it value.*" *Myrtle Beach Hospital, Inc. v. City of Myrtle Beach*, 341 S.C. 1, 8–9, 532 S.E.2d 868, 872 (2000) (emphasis added). Under his modified consulting agreement, Dickerson was compensated at over $250,000 per year by LRM, the managing entity of all the LandBank companies. The modified agreement secured Dick-

---

3. Because we affirm the Master's finding that there was no meeting of the minds between Garrell and/or LandBank Fund VII and Dickerson concerning Dickerson's fee agreement, we need not address Dickerson's arguments regarding Garrell's presumptive authority to bind LandBank Fund VII.

4. Dickerson also argues that the ultimate closing of the D.R. Horton deal by LandBank VII amounts to a ratification of the contract and, with it, Dickerson's fee. This issue is wholly without merit. The present appeal concerns an alleged fee agreement between Dickerson and LandBank VII, not a material term of the contract between LandBank VII and D.R. Horton. It would be a gross misapplication of the ratification doctrine to conclude that Dickerson, acting unilaterally as the "representative" of LandBank VII, is entitled to the fee because he inserted it into a contract between two other parties, notwithstanding the fact that the land sale contract was ultimately consummated.

erson's service to LRM, an entity with the stated goal of considering additional LandBank investor opportunities, for an indefinite period of time. Furthermore, Dickerson's consulting agreement expressly states that future "[t]ransaction/performance based compensation" will be granted only "when justified and agreed to in advance."

Considering Dickerson's lucrative contract with LRM, we agree with the Master–in–Equity's conclusions on this matter. We find nothing in the record on appeal that would make recovery by Dickerson on his quantum meruit claims appropriate or equitable. The fact that LandBank Fund VI and VII were not in existence when Dickerson entered his consulting contract with LRM does not persuade this court such ventures were not contemplated when Dickerson's future services were secured.

For the foregoing reasons, the Master–in–Equity's decision is

**AFFIRMED.**

BEATTY and SHORT, JJ., concur.