742 S.E.2d 869

Roger Wendell WALKER, as the Personal Representative of the Estate of Kenneth Ray Walker and individually as a surviving child and Devisee of the Decedent, Kenneth Ray Walker (d/o/d 09/20/2008), Jimmy Ray Walker, and Wilson Whitney Walker as surviving children and Devisees of the Decedent, Kenneth Ray Walker, who died testate on 09/20/2008, Respondents,

v.

Catherine W. BROOKS, Appellant.

Appellate Case No. 2011–199991.

No. 5112.

Court of Appeals of South Carolina.

Heard Jan. 15, 2013.

Decided April 10, 2013.

Rehearing Denied June 10, 2013.

Everett H. Garner and Benjamin A. Dunn, II, both of Holler, Garner, Corbett, Ormond, Plante & Dunn, of Columbia, for Appellant.

Gregory S. Forman, of Charleston, and Everett W. Bennett, Jr., of Walterboro, for Respondents.

LOCKEMY, J.

Catherine W. Brooks appeals the Special Referee's (Referee) ruling that she held only an equitable mortgage on the subject property. We reverse.

**FACTS**

This case revolves around the characterization of two deeds given to Brooks by her brother, Kenneth Ray Walker (Decedent), which purportedly conveyed properties on Cooks Hill Road in Colleton County (Cooks Hill properties). Decedent owned and lived on two hundred acres of his family's farm in Colleton County, including the Cooks Hill properties. In the years prior to Decedent deeding the Cooks Hill properties to Brooks, Decedent's other sister, Jane Ballagh, helped him financially. At one point, Ballagh mortgaged some of Decedent's property in an effort to save his homestead. The mortgage was eventually placed in her name [1] and was satisfied at a later point by Brooks, on behalf of Decedent.

Brooks financially supported Decedent during the 1990s and into the beginning of the early 2000s. Her financial support included but was not limited to providing Decedent with a telephone line, paying his power and cable bill, buying him groceries, and giving him cash on at least a weekly basis. Brooks claimed she spent "everything in this world" on Decedent. During this time, she also helped him receive Social Security Disability (SSD) benefits and was made his trustee by the federal government for purposes of those SSD benefits. All parties testified she had a close familial relationship with Decedent.

In 1996, Decedent executed the first deed of the Cooks Hill properties to Brooks for $13,250.00. The property was as-

---

1. The mortgage was originally recorded in Patsy Walker's name, but was then assigned to Ballagh.

sessed in the amount of $36,000.00. Brooks testified Decedent conveyed the land to her because she did more for him than anybody in his life, and he told her not to allow anyone to "fool her out of it" after he passed away. She stated Decedent requested only $13,250.00 for the property because she had already spent so much of her money supporting him; however, she admitted never writing him a check or giving a lump sum to him in consideration to Decedent for the deed. She then explained the sum was placed on the deed simply because the attorney required it. Decedent made a second conveyance of the Cooks Hill properties, approximately fifteen acres, to Brooks in 2003 for a nominal sum. That property was assessed at $85,000.00.

After the execution of each deed, Decedent continued negotiating leases with businesses operating on the Cooks Hill properties, collecting rent from those businesses for his own personal use, and maintaining the Cooks Hill properties. Roger Wendell Walker, one of Decedent's sons, would often pick up rent checks and cash them for his father. At times, Decedent would direct Roger to cash the check and deposit a certain amount into Brooks's bank account. Two witnesses working for companies leasing land within the Cooks Hill properties testified to the direct involvement they had with Roger and Decedent, even after the deeds were executed. Brooks admitted she never exercised any dominion or control over the Cooks Hill properties.

Several writings presented were alleged to be related to the execution of the two deeds. First, on July 16, 2004, Brooks handwrote an agreement on behalf of Decedent that provided Decedent

would like for all the money from Larry Herndon [with Lowcountry Sand and Gravel (Lowcountry) ] to be paid to Catherine W. Brooks until she is paid sixty thousand dollars at that time she is to release to Kenneth Walker all the property off Cooks Hill Road ... Any money Kenneth pays Catherine W. Brooks will be toward the sixty thousand dollars.

(Repurchase Memorandum).

Roger explained he leased his own property, which was separate from the Cooks Hill properties, to Lowcountry for

sand dredging and received all monies from that lease. There was a second lease between Lowcountry and Brooks, because the water runoff from the sand dredging ran across the Cooks Hill properties. Brooks stated Decedent had proposed sand dredging from a pond on the Cooks Hill property, which they would offer to Herndon for purchase, and the profits from that potential venture are what are referenced in the Repurchase Memorandum. She stated the venture never came to fruition. However, Brooks further conceded the Repurchase Memorandum stated she would release the land to Decedent after *any* payment of $60,000.00 from Decedent, even if it did not come from Lowcountry's sand dredging.

A second document consisting of Brooks's and Decedent's handwriting reflected Decedent's starting balance owed to Brooks in the amount of $60,000.00 (Ledger). Roger testified the Ledger was to account for the balance Decedent owed Brooks. After the initial $60,000.00 figure, the Ledger detailed numerous payments, of which many were initialed by Brooks to show her receipt of those payments.[2] The Repurchase Memorandum established that any monies paid to Brooks from the sand dredging were to be subtracted from the balance in the Ledger in exchange for the return of the Cooks Hill properties. Roger claimed that once the balance in the Ledger was paid, it was understood the Cooks Hill properties would be re-conveyed to Decedent. Roy Walker, Decedent's brother, confirmed that Brooks agreed to sign the property back to Decedent. Brooks asserted Decedent's payments in her ledger appearing to pay down the $60,000.00 consisted of rent that was ultimately hers, because the Cooks Hill properties were in her name. Thus, she essentially "was being paid with her own money." Brooks conceded that had Decedent paid her the $60,000.00 from profit off of Lowcountry's sand dredging business, she would have deeded the Cooks Hill properties back to Decedent.

A third document in Brooks's handwriting contained a list of costs, including but not limited to Brooks's payments to satisfy Ballagh's previous mortgage on Decedent's property, the costs

---

2. She indicated she documented some of the payments because Decedent asked her to do so, and she did anything he asked because of his intimidating nature.

of preparing the deeds for the Cooks Hill properties, a motor transmission, and light bills (Cost List). At the top of the Cost List, the document has a header stating "Money For Dredge." Roger asserted the Cost List showed how Brooks totaled the $60,000.00 debt shown on the Ledger. Brooks testified it was simply a coincidence that the figures on the Cost List with interest totaled close to $60,000.00. She claimed the $60,000.00 balance on the Ledger originated when Decedent told her Lowcountry's sand dredging was going to begin, and the profit from the sand dredging would be split between her and Decedent. She testified Decedent randomly chose a sum of $60,000.00 to pay Brooks from his profit from the sand dredging.

After Decedent's death, Brooks claimed the deeds were intended to place title of the Cooks Hill properties in her name and were absolute on their face; thus, she was the rightful owner of the properties. Brooks testified she did not have anything to leave her children without the Cooks Hill properties because she had given all her money to Decedent, and her children wanted an inheritance. She admitted attempts were made prior to and after Decedent's death to pay off the balance shown on the Ledger in return for the Cooks Hill property, but she refused them. She stated because she had held the property for quite a while, its value had increased, and she would not sell it for less than it was worth.

Decedent's sons and heirs, Roger, Jimmy Ray Walker, and Wilson Whitney Walker (collectively referred to as Respondents) brought this action claiming they were the rightful owners of the Cooks Hill properties, as heirs of Decedent, and Brooks's deeds were intended to create an equitable mortgage in the properties in return for the financial assistance Brooks provided to Decedent during his lifetime.

The Referee found a longstanding fiduciary relationship existed between Brooks and Decedent, and Brooks helped to financially support Decedent several times. Further, he found Decedent deeded properties to Brooks that were valued at much greater amounts than any debt Decedent ever owed her. He also found Brooks knowingly allowed Decedent and one of his sons to totally control the premises during the time the properties were in her name, and the tenants of the properties

for the most part dealt exclusively with Decedent or one of his sons. Finally, he noted Brooks admitted she wrote the note that stated Decedent owed her $60,000.00, and upon payment of that debt, she would deed the properties back to him.

The Referee stated these facts were controlled by *Gregorie & Son v. Hamlin,* 273 S.C. 412, 257 S.E.2d 699 (1979), and the evidence supported a finding of an equitable mortgage. Thus, the Referee determined that upon payment of the debt found to be owed by Respondents to Brooks, Respondents were entitled to a deed conveying the properties to them. This appeal followed.

## STANDARD OF REVIEW

■ On appeal from an action sounding in equity, "this court may view the facts in accordance with our preponderance of the evidence." *Anderson v. Buonforte,* 365 S.C. 482, 488, 617 S.E.2d 750, 753 (Ct.App.2005). "However, we should not disregard the findings of the special referee, who was in a better position to weigh the credibility of witnesses." *Id.* (citing *Tiger, Inc. v. Fisher Agro, Inc.,* 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989)).

## LAW/ANALYSIS

### Equitable Mortgage

Brooks argues the Referee erred in determining the deeds conveying the Cooks Hill properties did not pass fee title, but rather constituted an equitable mortgage against the land. Specifically, she contends the present facts are distinguishable from *Gregorie,* and thus, the Referee erred in his application of that case. We agree.

In *Gregorie,* the subject property (Oakland Plantation) was owned by an oil distributorship, Gregorie & Son, that was experiencing financial difficulty. 273 S.C. at 415, 257 S.E.2d at 700. Gregorie & Son was having particular difficulty with two of its suppliers, Arkansas Fuel Oil Corporation (Arkansas Fuel) and Carolina Fleets, Inc. (Carolina Fleets). *Id.* Hamlin was a neighbor and longtime friend of the family that owned Gregorie & Son, and he began loaning money to the business in the 1950s at the request of one of the Gregories. *Id.* Additionally, Hamlin co-signed a promissory note held by

Arkansas Fuel in the principal amount of $30,000.00 and was the one financially responsible promisor. *Id.*

During that time, Gregorie & Son's operation was turned over from father, Gregorie, Sr., to son, Gregorie, Jr. *Id.* In 1960, Arkansas Fuel and Carolina Fleets began pressing for collections upon their respective debts. *Id.* The amount of money needed to pay the debts to both Arkansas Fuel and Carolina Fleet was $39,791.68. *Id.* at 416, 257 S.E.2d at 701. Attempts to sell Gregorie & Son in 1961 because of its continuing debt were unsuccessful, and Hamlin and Gregorie, Jr., approached First National Bank of South Carolina (First National) about the possibility of a loan to pay off Gregorie & Son's debts. *Id.* The loan was secured by Oakland Plantation. *Id.* As a result of discussions, First National and Gregorie, Sr. executed a note and mortgage on January 26, 1961, in the amount of $35,000.00. *Id.* The note, but not the mortgage, was guaranteed by Hamlin. *Id.* On the same date, Gregorie, Sr., executed a deed purporting to convey Oakland Plantation to Hamlin, the consideration being the assumption of the balance due on the note to First National and five dollars. *Id.* In addition to the deed, Gregorie, Jr., on behalf of Gregorie, Sr., and Hamlin executed a repurchase agreement on January 31, 1961. *Id.*

A second mortgage was executed on behalf of Gregorie & Son, Gregorie, Sr., and Gregorie, Jr., in favor of Hamlin in the amount of $35,000.00. *Id.* at 417, 257 S.E.2d at 701. Security for this mortgage was real estate and rolling stock of Gregorie & Son. *Id.* The question before the court was whether the deed conveying Oakland Plantation and the accompanying agreement was intended as a deed absolute or as security for a debt and hence a mortgage. *Id.* at 414, 257 S.E.2d at 700.

The court found an equitable mortgage did exist, and outlined eight factors it considered in its determination: (1) the existence and survival of a debt; (2) a deed plus a separate agreement; (3) previous negotiations of parties; (4) inadequacy of consideration/price; (5) dealings between parties; (6) terms of the contract for conveyance; (7) burden of proof; and (8) defenses.[3] *Id.* at 419, 257 S.E.2d at 702.

---

3. All parties admit the eighth factor of defenses is irrelevant under the present facts.

We will now examine the relevant *Gregorie* factors in the context of the present facts.

**Outstanding Debt**

Brooks contends the Respondents presented no evidence of an outstanding debt between her and Decedent to indicate the deeds to the Cooks Hill properties were absolute in nature. We disagree.

> A strong indicia of whether the purported conveyance was intended as security for a debt or was a sale or deed is reflected by the existence or lack thereof of a debt or liability between the parties either existing prior to the contract or rising from a loan made at the time of the contract whereby the debt is still left subsisting after the transaction in question.

*Id.* (citing *Hamilton v. Hamer*, 99 S.C. 31, 57–58, 82 S.E. 997, 1004 (1914)).

> The effect of [the] existing debt usually turns out to be "that the payment[ ] stipulated for [in] the agreement to reconvey is in reality the payment of this existing debt, [then] the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instrument[ . . . ]."

*Id.* at 420, 257 S.E.2d at 702 (quoting *Hamilton*, 99 S.C. at 35, 82 S.E. at 999). The *Gregorie* court noted an uncontested memorandum of agreement accurately outlined the history of the relationship between Gregorie, the debtor, and Hamlin, the creditor, and the existence of a debt between them. *Id.* at 420, 257 S.E.2d at 702–03. The court also found it compelling that the payment stipulated in the agreement to re-convey was approximately the same amount as the amount of the existing debt. *Id.* at 421, 257 S.E.2d at 703.

Here, the evidence established an existing debt between Decedent and Brooks. Brooks testified she spent all her personal money helping Decedent. She purchased groceries, gave him cash, and helped with utilities. The Cost List enumerated debts accrued from 2003 until 2008, providing an even clearer example of the amount Decedent owed Brooks. The debt was close to $60,000.00 with interest included, which was the amount enumerated in the Repurchase Memorandum for re-purchase of the Cooks Hill properties. Accordingly,

Brooks presented evidence of an existing and surviving debt between the two parties.

**Deed In Addition to a Separate Agreement**

■ Brooks claims the Repurchase Memorandum was not contemporaneous with the deeds, which she argues was necessary to find an equitable mortgage. Under these facts, we agree the documents were not executed within a reasonable time frame to be construed together, but we decline to adopt the proposition that the documents must be executed contemporaneously to find an equitable mortgage.

■ "Where a separate instrument is executed as a part of the same transaction as the conveyance, the two instruments are construed together if the writing is in the nature of a conditional sale or a re-purchase agreement." *Id.* (citing 54a Am.Jur.2d *Mortgages* § 86 (2009)). The *Gregorie* court found "a conveyance accompanied by a re-purchase agreement is a strong circumstance to be considered in the determination between a deed absolute and equitable mortgage." *Id.* at 422, 257 S.E.2d at 703.

Here, the first deed was executed on March 19, 1996. The second deed was executed on February 5, 2002. The Repurchase Memorandum was executed on July 16, 2004. Unlike the repurchase agreement in *Gregorie,* the Repurchase Memorandum here did not accompany the deeds because it was written more than a year after the execution of the second conveyance. *See* 59 C.J.S. *Mortgages* § 71 (2009) (stating "the character of the transaction is fixed at its inception, and as a general rule, the only facts and circumstances that may be considered in determining whether a mortgage was intended are those which existed at the time the instrument was executed"). The Ledger has costs beginning in 2003, but the actual origin date of the Ledger is unknown. These documents are insufficient to support a finding of an equitable mortgage. We believe it would undermine public policy to allow such vague documentation to support a change in the nature of a document, which on its face is an absolute deed, to an equitable mortgage, particularly in this instance, in which the Repurchase Memorandum was written nearly a year after the execution of the final deed. This factor is a strong

indicator the conveyances were not intended to be an equitable mortgage.

### Previous Negotiations of Parties

■ Brooks argues Respondents presented no evidence of prior negotiations between the parties because their interactions were the result of being siblings and were not business related. Thus, no hallmarks of a lender and borrower relationship existed as they did in *Gregorie.* We agree.

Addressing this factor, the *Gregorie* court stated " '[o]n the question whether a deed absolute in form was intended as a mortgage, it is proper to consider the previous negotiations of the parties, their agreements and conversations[, conduct,] and the course of dealings between them prior to and leading up to the deed in question.' " *Id.* (quoting 59 C.J.S. *Mortgages* § 76 (2009)). The *Gregorie* court listed five indicators used to determine whether or not a sale was in fact intended:

1. That there was no evidence that the owner desired to sell or that the lender desired to purchase.

2. That during the negotiations nothing was said about a sale of that property.

3. That no price was fixed as a selling value of the property and no discussion along that line was had.

4. That no attempt was made to ascertain the real value of the property upon which a sale would reasonably be based, greater liberality being exercised when a loan was intended.

5. That the grantees made no inquiry as to the value of the land.

*Id.* at 422, 257 S.E.2d at 703–04.

In *Gregorie,* the "circumstances . . . indicate[d] overwhelmingly that no outright sale was ever contemplated by either party." *Id.* at 422, 257 S.E.2d at 704. The court found there was neither an agreement to sell nor a contract of sale. *Id.* at 423, 257 S.E.2d at 704. Further, it found significant the party claiming title established absolutely no evidence he took any of the normal and customary steps that would indicate he was buying the property. *Id.*

The circumstances in *Gregorie* that overwhelmingly established a sale was not contemplated by either party are not present here. The Repurchase Memorandum was written

nearly a year after the final conveyance, and thus, it was not evidence of any prior negotiations between the parties. The close relationships and familial transactions resulted in informal and inadequately documented transactions, unlike in *Gregorie,* in which a business entity was involved. The price of Decedent's first conveyance was discussed, and Decedent indicated he was selling the land at a lower price due to the financial support Brooks had given him. The second conveyance was for a nominal amount of money, but it was conveyed approximately eight years later, and during that time, Brooks had continued to help Decedent financially. We note Decedent was familiar with the process of mortgaging his property, because he previously mortgaged his property to Ballagh, yet he chose to deed the land in question to Brooks. Accordingly, we do not find the previous negotiations of the party support the argument that a mortgage was intended instead of the absolute deed that was executed.

### Inadequacy of Consideration/Price

██ Brooks maintains the vastly different relationship of the parties in this case negates this factor of any real probative value. We agree.

> "[I]f the consideration passing between the parties, or the amount to be paid by the grantor on exercising his right to repurchase, would be fairly proportioned to the value of the property, if considered as a debt or loan secured by a mortgage thereon, but grossly inadequate if regarded as the price of the land on an absolute sale, this will tend strongly to show that a sale could not have been intended, but that the transaction should rather be treated as a mortgage."

*Id.* at 424–25, 257 S.E.2d at 705 (quoting 59 C.J.S. *Mortgages* § 77 (2009)).

This factor weighs in favor of Decedent. A review of the record establishes the deeds reflect a lower price than the assessed value of the land. The first conveyance was given for a relatively more reasonable price than the second, which was simply a nominal value. However, Brooks admitted never paying a lump sum amount for consideration of the first conveyance.

### Dealings Between the Parties

■ Brooks argues that as with prior negotiations between her and Decedent, her dealings with Decedent were not business related, and as such, no evidence substantiated the existence of an equitable mortgage. We agree.

The *Gregorie* court noted that "another indicia of customary and normal course of dealings which gives aid in determining the intention of the parties is how the contact between the parties to the transaction originated, and if the grantor attempted to borrow money at the inception of the transaction." *Id.* at 426, 257 S.E.2d at 706.

Here, Brooks helped Decedent financially throughout the last years of his life. The record does not contain evidence the conveyances arose out of Decedent's specific need for any further money, other than his continuing and ongoing need for financial help to live. In *Gregorie,* the transaction in question "was a direct result of Gregorie[, Sr.,] making application for a loan to both First National Bank and to Hamlin," whereas here, no specific transaction occurred for which Decedent would intend to mortgage the property. Again, Decedent and Brooks had an ongoing relationship in which she provided financial aid to him, and it appears Decedent deeded these properties on his own accord. This factor weighs in favor of Brooks.

### Terms of Contract for Conveyance

■ Brooks contends neither the terms of the deeds nor the Repurchase Memorandum contained any evidence to show Decedent retained an interest in the property. We agree.

The terms of the contract must be examined, and significantly, the court must find whether the repurchase agreement sets a deadline whereby if the money owed is not paid by that time, then the creditor claims to have an absolute fee simple title. *Id.* at 428–29, 257 S.E.2d at 706–07. In *Gregorie,* the court noted two cases where the repurchase agreements set a deadline whereby if the money owed was not paid by that time, the creditor claimed to have an absolute fee-simple title. *Id.* at 429, 257 S.E.2d at 707. The court found no reason for such a stipulation if one already had title under the absolute deed received from the grantee. *Id.* We also find noteworthy the *Gregorie* court found Hamlin's own testimony, the party

attempting to establish an absolute deed, convincingly showed a sale was not contemplated. *Id.* at 429–30, 257 S.E.2d at 707.

In the present case, Brooks's testimony did not produce such convincing evidence in favor of an equitable mortgage. Further, the Repurchase Memorandum did not have a stipulation granting Brooks a fee absolute should Decedent fail to meet a deadline for payment of $60,000.00. The Repurchase Memorandum simply stated that after Decedent paid $60,000.00 to Brooks, she would deed the Cooks Hill property back to him. Brooks was adamant the property was sold or given to her in fee absolute because of her financial support to Decedent. The record contains no evidence of any language in the Repurchase Memorandum that would give rise to an inference of a mortgage. Accordingly, we find this factor weighs in favor of Brooks.

**Burden of Proof**

Finally, an allegation that a deed, absolute on its face, is in fact a mortgage "must be sustained by testimony prima facie showing that [the allegation] is true." *Id.* at 431, 257 S.E.2d at 707. "When this is done, it removes the presumption arising from the fact that a paper is presumed to be what its face imports." *Id.* at 431, 257 S.E.2d at 707–08. "When this is done, it is incumbent on the mortgagee to remove the inferences that may be drawn from such prima facie showing. This is sometimes spoken of as the burden of proof, but it is simply making it incumbent on the mortgagee to disprove the case as then made." *Id.* at 431, 257 S.E.2d at 708.

While the Repurchase Memorandum and Decedent's Cost List may have created a prima facie showing the deeds created equitable mortgage, we find Brooks has disproved that showing. *See* 54a Am.Jur.2d *Mortgages* § 93 (stating for a court to find an instrument absolute on its face was intended by the parties as a mortgage, "[t]he evidence must be, according to various statements, clear and convincing, plain, credible, satisfactory, unequivocal, unambiguous, and conclusive and [i]t will not suffice if composed of loose and random statements, or facts and circumstances of doubtful import"). As we stated above, many of the factors that must be shown to establish an equitable mortgage did not fall in Respondents' favor.

## CONCLUSION

The writings and testimony presented in this case were vague and inadequate and simply did not come close to the amount of evidence put forth in *Gregorie* to establish an equitable mortgage. Moreover, the Repurchase Memorandum in the present case was written long after the second conveyance, which we find is a strong indicator that at the time of execution, the conveyances were not intended to be an equitable mortgage. Brooks successfully disproved Respondents' prima facie showing. Accordingly, the Referee's order is

**REVERSED.**

SHORT and KONDUROS, JJ., concur.