503 S.E.2d 712

James E. GASTINEAU, Respondent,

v.

Leigh MURPHY, Individually, and as Executive Director of the Beaufort County Mental Retardation Board, the Beaufort County Mental Retardation Board, Beaufort County Council, the State Department of Mental Retardation, Defendants,

Of whom the Beaufort County Mental Retardation Board is Petitioner.

No. 24800.

Supreme Court of South Carolina.

Heard Nov. 19, 1997.

Decided June 8, 1998.

Rehearing Denied Sept. 3, 1998.

Charles E. Carpenter, Jr., and Deborah Harrison Sheffield, of Richardson, Plowden, Carpenter & Robinson, P.A., Columbia, and James S. Gibson, of Howell, Gibson & Hughes, P.A., Beaufort, for petitioner.

V.M. Manning Smith, of Moss & Kuhn, P.A., Beaufort, for respondent.

WALLER, Justice:

We granted certiorari to review the Court of Appeals' opinion in *Gastineau v. Murphy*, 323 S.C. 168, 473 S.E.2d 819 (Ct.App.1996). This is a Whistleblower action in which the Court of Appeals affirmed the jury's verdict for respondent, James Gastineau (Gastineau), finding he had been dismissed from his job in retaliation for reporting his employer's illegal conduct. We reverse.

## BACKGROUND/FACTS

In 1988, the General Assembly enacted the South Carolina Whistleblower Act to protect public employees from retaliation for reporting violations of law by public bodies or their officials. Act No. 354, 1988 S.C.Acts 2648 (codified at S.C.Code Ann. §§ 8–27–10 to –50 (Supp.1989)) (amended 1993). At the time Gastineau's claim arose, the Act created a rebuttable presumption of retaliatory discharge if an employee was terminated within one year of reporting any violation or wrongdoing. S.C.Code Ann. § 8–27–30 (Supp.1989) (amended

1993).[1] An employer could rebut this presumption by showing the employee was discharged for reasons other than whistleblowing. S.C.Code Ann. § 8–27–40 (Supp.1989) (amended 1993); *Gamble v. City of Manning*, 304 S.C. 536, 537, 405 S.E.2d 829, 829 (1991).

In this case, Gastineau showed he was fired within one year of reporting conduct which he believed was illegal. Petitioner, the Beaufort County Department of Mental Retardation Board (Board), then offered evidence showing Gastineau was fired for poor job performance. Furthermore, petitioner offered evidence showing Gastineau could not have been fired in retaliation for making a report because Gastineau's supervisor was unaware of Gastineau's report when she fired him. After the jury returned a verdict for Gastineau, Board moved for judgment *non obstante veredicto* (JNOV). The trial judge refused to grant Board's motion, and the Court of Appeals affirmed his decision.

## ISSUE

Did the Court of Appeals err in denying Gastineau's motion for JNOV?

## DISCUSSION

 A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict. *Crossley v. State Farm Mutual Auto. Ins. Co.*, 307 S.C. 354, 357, 415 S.E.2d 393, 395 (1992). In deciding a motion for JNOV, the evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party; if more than one inference can be drawn, the case must be submitted to the jury. *Id.*

 The evidence viewed in the light most favorable to Gastineau shows he was hired by the Board as a Qualified Mental Retardation Professional (QMRP) and Residential Director of a facility which housed mentally handicapped individuals. He began working on April 2, 1990, under the supervision of Leigh Murphy, Executive Director of the Board.

---

1. The 1993 amendment eliminated this presumption.

On July 16, 1990, Gastineau's wife, Christy Gastineau, also began working for the Board; she was hired as a trainer/driver for the Day Program at the Beaufort County Rehabilitation Center, a sheltered work program for the mentally and physically handicapped. Within two weeks of starting her job, Mrs. Gastineau drove several clients to work at a construction site owned by Murphy's husband. After seeing the site and asking questions concerning the clients' wages, Mrs. Gastineau became concerned the clients were working in unsafe conditions and being underpaid. She voiced these concerns to her husband. She also confided in her superiors, Barbara Greenberg and Susan Muckenfuss. According to Mrs. Gastineau, Muckenfuss told Greenberg that "this is something we need to talk to [Murphy] about."

Two or three weeks later, Gastineau reported Murphy's husband's possible wage violations to Alice Shook, who worked for the South Carolina Department of Mental Retardation (SCDMR). Shook repeated Gastineau's concerns to her immediate supervisor, Wilson Inabinet, and his supervisor, Brant Coyle. Inabinet and Coyle consequently decided to send a staff member from SCDMR to review the Day Program in Beaufort. Gary Hudson, who annually inspected programs licensed by SCDMR and had already performed his annual inspection of Beaufort's program, was sent back to Beaufort to perform a follow-up visit.

On October 31, 1990, Murphy discharged Gastineau from his position as a QMRP. Gastineau subsequently brought this suit alleging he was discharged in retaliation for whistleblowing. According to Gastineau, he was fired because he reported Murphy's husband to SCDMR for improperly paying clients of his facility.

■ No reasonable jury could have concluded from the evidence introduced at trial that Gastineau was fired in retaliation for reporting conduct which he believed to be illegal. First, the evidence viewed in the light most favorable to Gastineau does not support a finding that Murphy was even aware of Gastineau's report at the time she discharged him. No direct evidence was introduced; in fact, Murphy testified she did not learn about Gastineau's report until November of 1990. Furthermore, the circumstantial evidence surrounding

Gastineau's report is insufficient to find Murphy was aware of the report.[2] According to the Gastineaus, they informed three people of their suspicions; Gastineau introduced no evidence that any of these three discussed the Gastineaus' concerns with Murphy.[3] One of these three did convey Gastineau's concerns to two other people, but these two were not called to testify, and no evidence showed they informed Murphy of Gastineau's report.

■ The Court of Appeals held the jury may have inferred that Murphy learned about Gastineau's report during Gary Hudson's review. 473 S.E.2d at 824. We disagree.

The jury could not have reasonably inferred Murphy learned of Gastineau's report from the circumstances of Hudson's inspection. Hudson died prior to trial and therefore did not testify. Alice Shook testified that Hudson, who annually inspected programs licensed by SCDMR and had already performed his annual inspection of this program, was sent to perform a follow-up visit. Shook did not know what instructions Hudson was given because she was not present when he was told to go to Beaufort. Shook testified this type of follow-up visit was not unusual. According to Shook, the inspector does not notify the program of the impending inspection and does not tell the program the purpose of the visit. She also testified this type of visit would normally lead to a written report, and although she searched for a report, she did not find one.

Viewing the evidence in the light most favorable to Gastineau, the circumstances under which other inspections were

---

2. For circumstantial evidence to be sufficient to warrant the finding of a fact, the circumstances must lead to the conclusion with reasonable certainty and must have sufficient probative value to constitute the basis for a legal inference, not for mere speculation. *Holland v. Georgia Hardwood Lumber Co.*, 214 S.C. 195, 204–205, 51 S.E.2d 744, 749 (1949). The facts and circumstances shown should be reckoned with in the light of ordinary experience, and such conclusions deduced therefrom as common sense dictates; the existence of a fact cannot rest in speculation, surmise or conjecture. *Id.*

3. In fact, Barbara Greenberg could not recall any complaints Gastineau or his wife made concerning the safety of clients or their wages, and Susan Muckenfuss testified neither of the Gastineaus made any complaints to her concerning client safety or wages.

performed do not lead with reasonable certainty to the conclusion that Hudson would have told anybody he was there because of Gastineau's report. The evidence does not even conclusively show that Hudson himself knew he was sent to Beaufort because of Gastineau's report. The only evidence in the record is that Hudson would not have revealed the reason for his visit, and that his visit was not out of the ordinary.

■ Moreover, to rebut the presumption of retaliation created by the Whistleblower Act, Board produced overwhelming evidence showing Gastineau was discharged for failing to fulfill the responsibilities of his job. At trial, evaluations of Gastineau's job performance after three months and six months were admitted into evidence. Although Gastineau showed improvement in some areas during the time between these two evaluations, the six-month evaluation showed an overall decline in Gastineau's performance, notably in areas such as quality of work, judgment, planning, organizing, staffing, and policy implementation. The notes taken by his supervisor Murphy show Gastineau made frequent financial and payroll errors and often needed to be reminded of deadlines. The notes also indicate Gastineau was not fulfilling his responsibility of ensuring compliance with licensing regulations set out by the Department of Health and Environmental Control (DHEC).[4]

Gastineau admitted he was struggling with his job due to the amount of paperwork involved. One of Gastineau's witnesses also confirmed Gastineau did not get his clerical work done.

Shortly after his six-month evaluation, Murphy gave Gastineau a written warning which showed he was not improving despite being counseled.[5] The warning noted and Gastineau admitted he took two staff members on a trip to Walterboro

---

4. As discussed below, compliance with DHEC regulations is critical because failure to do so could jeopardize federal funding.

5. Contrary to the dissent's assertion, the fact that Gastineau was made a permanent employee after his six-month probationary period does not rebut the Mental Retardation Board's claim that he was subsequently discharged for "good cause." The uncontradicted evidence is that Beaufort County personnel policies dictated that employees were **automatically** given permanent status after a six month evaluation.

despite being "advised" by Murphy not to do so. The warning informed Gastineau he could be discharged for another offense.

Gastineau's termination letter notes he was instructed to review existing policies and make recommendations for changes, which he admitted he failed to do. Gastineau also admitted he failed to hold team meetings as required by federal regulations.

An inspector named Risley Linder testified he conducted a "Quality Assurance Survey" in August of 1990. This type of review was done as a practice inspection to help the facility prepare for DHEC certification inspections. DHEC certification was essential to the facility because without it, the facility would lose its federal funding which amounted to seventy-five percent of its budget. In August, Linder found deficiencies in Gastineau's unit which were serious enough to have affected the program's certification. Gastineau was notified of these problems during a post-inspection interview with Linder.

Linder performed a follow-up visit in October. Although some of the deficiencies had been fixed, Linder found a more alarming problem: a significant amount of data and progress notes for which Gastineau was responsible was missing from files. Linder testified this was a more serious problem for certification than inadequate notes. According to Linder, having all data and progress notes in the files at all times was critically important since DHEC did not notify facilities of when it would inspect. Linder believed the state of Gastineau's records on the day he visited would have caused DHEC to begin its decertification process.

Linder's comments dismayed Murphy because they showed Gastineau was not fulfilling his role as QMRP. Consequently, Murphy and a colleague took over as acting QMRPs to give Gastineau an opportunity to review all of his paperwork from the beginning of his job and make sure it complied with DHEC requirements. When Gastineau failed to do so, Murphy realized he would never be able to fulfill the role of QMRP, so she discharged him. Gastineau's termination letter includes a detailed description of his unsatisfactory work history and was admitted into evidence.

The evidence shows Gastineau was unable to perform his job to the satisfaction of his supervisors and unwilling to follow directives. Further, his incompetence was threatening the facility's funding. The only reasonable inference to be drawn from the evidence is that Gastineau was not fired in retaliation but for being an unsatisfactory employee. Accordingly, the trial judge erred in refusing to grant Board's motion for JNOV.

**REVERSED.**

FINNEY, C.J., and MOORE, J., concur.

TOAL and BURNETT, JJ., dissenting in separate opinion.

TOAL, Justice:

I respectfully dissent.

In ruling on motions for a directed verdict or judgment *non obstante veredicto,* the trial court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party, and if it is susceptible of more than one reasonable inference, the case should be submitted to the jury. *Unlimited Services, Inc. v. Macklen Enterprises, Inc.,* 303 S.C. 384, 401 S.E.2d 153 (1991). The majority opinion does not utilize this standard. Instead, it takes a view of the evidence in the light most favorable to the Mental Retardation Board. I find that although there was not direct evidence offered, there was ample circumstantial evidence presented below to warrant submission to the jury the issue of whether Gastineau was terminated because of his complaint.

Gastineau reported possible safety and wage violations concerning handicapped clients who worked with the Beaufort County Rehabilitation Center. He was discharged shortly after his whistleblowing. These violations related to handicapped individuals who had been hired by the husband of Leigh Murphy—the Executive Director of the Mental Retardation Board. Gastineau informed Alice Shook of the South Carolina Department of Mental Retardation about the possible violations. Shook, in turn, informed her supervisors. These supervisors decided to send Gary Hudson to conduct an inspection of the Rehabilitation Center. Hudson conducted the inspection; unfortunately, he died prior to trial. No

written report of his visit was found. Furthermore, Gastineau's wife, who worked with the Rehabilitation Center, had expressed concerns to her supervisors about the potential violations. These supervisors, according to Mrs. Gastineau, had stated that they would discuss the matter with Leigh Murphy.

The circumstances of this case, considered in the aggregate and viewed in the light most favorable to Gastineau, create a factual issue as to what Mrs. Murphy knew and whether she fired Gastineau because of his whistleblowing. The majority is, in effect, acting as a thirteenth juror in reaching its conclusion, rather than determining if there was sufficient evidence for the matter to be submitted for the jury.

Moreover, evidence does not support the position that Gastineau was terminated for good cause. He had been made a permanent employee after a six-month probationary period. Shortly after becoming a permanent employee, he was fired. Although his evaluations were below expectations in some areas, they exceeded expectations in others. Yet, he was suddenly terminated after he disclosed the potentially damaging information about the handicapped clients. The Mental Retardation Board cannot grant Gastineau a permanent position, based on his employment record, and at the same time claim to fire him for "good cause" on the basis of the identical record.[1]

I would affirm the Court of Appeals' affirmance of the trial court's ruling. This was clearly a case for the jury to decide.

---

1. In footnote 5 of its opinion, the majority asserts that Beaufort County personnel policies dictated that employees were "automatically" given permanent status after a six-month evaluation. There is no record citation to support this statement. This statement overlooks the fact that by definition a "probationary period" implies not automatic employment, but rather employment conditioned upon demonstration of fitness for a job. If Gastineau's record was as bad as was claimed, then surely he would not have been able to meet the requirements of his probationary period. He was evaluated shortly before the end of his six-month probationary period; he became a permanent employee at the six-month point; and he was terminated thereafter. The fact that the majority and dissent see these facts differently illustrates dramatically why this matter is a question of fact to be resolved by a jury.

I would uphold its verdict of $375,000 in favor of Gastineau. No challenge is made to the amount awarded.

BURNETT, J., concurs.