# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Stacy Singletary, individually and as personal
representative of the Estate of Sheldon Singletary,
Respondent,

v.

Kelvin Shuler, Appellant.

Appellate Case No. 2018-001386

---

Appeal From Charleston County
Mikell R. Scarborough, Master-in-Equity

---

Opinion No. 5823
Heard February 11, 2021 – Filed June 2, 2021

---

## AFFIRMED

---

Eduardo Kelvin Curry, of The Curry Law Firm LLC, of
North Charleston, for Appellant.

Thaddeus James Doughty, of Thad James Doughty,
Attorney at Law, of North Charleston, for Respondent.

---

**WILLIAMS, J.:**  In this civil matter, Kevin Shuler appeals a judgment granted
against him in a wrongful death and survival action.  Specifically, Shuler appeals
the master-in-equity's order (1) finding he was not entitled to self-defense
immunity under the Protection of Persons and Property Act[1] (the Act); (2) finding

---

[1] S.C. Code Ann. §§ 16-11-410 to -450 (2015).

the respondent presented evidence to support a finding of wrongful death; and (3) finding the respondent presented evidence of conscious pain and suffering to support a survival action. We affirm.

## FACTS/PROCEDURAL HISTORY

On April 19, 2012, at approximately 9:30 A.M., Shuler walked to the end of his driveway to check his mail. Sheldon Singletary (Decedent) pulled up in his car, and the two discussed a bachelor party Shuler attended the night before. Decedent then called several people, inviting them to come to Shuler's home. Shuler cooked breakfast for the people that came, and several of the guests consumed alcohol throughout the morning and into the afternoon. After breakfast, the male attendees decided to continue cooking and to have a cookout.

As the day progressed, Shuler and Decedent began consuming alcohol, resulting in a fight in Shuler's kitchen. Sharanika Morris, an eye-witness, testified that Shuler initiated the altercation by placing his hands in Decedent's face and slapping him. Initially, Morris thought the men were playing, but it became serious when a verbal altercation ensued and Shuler continued to touch Decedent. Morris testified that Decedent responded by slapping Shuler in the face, and the two men began to fight. Morris testified that after the fight was broken up, Shuler found a knife on the kitchen counter and threw it at Decedent. Morris asserted that Shuler did not tell the guests to leave, but everyone began to exit Shuler's home. As Morris left through the front door, Decedent was on Shuler's porch, and he asked her to go back into the house to get his jacket with his bail bondsman badge. Morris entered Shuler's home through a side door and saw Shuler exiting the home with a .45 caliber handgun. Morris stated she followed Shuler as he approached the front of his home with the handgun yelling "You see what you did to my face?" and "I should kill you." She stated Shuler walked to the porch and shot Decedent in the abdomen, and Decedent fell from the porch into the yard, landing on his back. She also testified that Decedent exclaimed "help me" several times before his eyes began rolling to the back of his head and he quit moving.

Conversely, Shuler testified that he and Decedent were talking prior to their altercation and that he was unaware of any argument between them. Shuler claimed Decedent initiated the altercation by shoving him, and when Shuler shoved back, Decedent punched him in the right eye, causing it to bleed. Shuler claimed he became delirious and fell to the ground. Shuler said Decedent kicked him several times in the ribs and in the face while he was on the ground, fracturing

his right eye orbital, two ribs, and breaking his nose.[2]  Shuler claimed he saw a knife in the kitchen, grabbed it, and began yelling for the crowd to leave his home. According to Shuler, no one left, and Decedent told him to put the knife down or else he would beat him further.  Shuler stated that Decedent left his home after the altercation ended but he did not know where he went and was nervous Decedent would return to further harm him.  Shuler went into his bedroom to retrieve his handgun, and as he was exiting the side door of his house, another guest told him to put the gun away and to calm down.[3]  Shuler testified that as he walked towards the front of his house with the guest, he saw someone jump at him from his porch, he raised the gun, and fired.[4]  The bullet struck Decedent while he was in the air, and Shuler testified Decedent landed on the ground face down.  Shuler stated he "fired out of reflex" and did not know whether he was shooting at a person.  He said Decedent did not move, talk, or moan after he shot him.  Decedent was shot at approximately 3:52 P.M.

When EMS arrived at the scene, Decedent was unconscious, and they intubated him.  Upon arrival at the Medical University of South Carolina (MUSC), Decedent was still unconscious, and he underwent two surgeries to stop his bleeding. Decedent's brother testified that between Decedent's surgeries, doctors told him Decedent could hear him.  The brother stated when he asked Decedent to squeeze his hand, Decedent complied.  However, Decedent's wife (Wife) testified that although doctors told her the same, Decedent was unresponsive to her voice the entire time she was at the hospital.  Doctors were unable to control Decedent's bleeding, and he was pronounced dead at 12:06 A.M. on April 20, 2012.

Wife filed suit against Shuler, individually and as the personal representative of Decedent's estate, for wrongful death, survival, and negligence.  At trial, Wife testified about Decedent's medical bills and his annual income from working as a longshoreman and bail bondsman.  She stated she received bills from MUSC totaling $203,251.25, and the master admitted the bills into evidence.  Wife also

---

[2] Shuler did not introduce any medical records or other evidence proving he sustained any injuries during the fight.

[3] On cross-examination at trial, Shuler admitted that no one followed him into his room to retrieve his gun and none of the guests were threatening him at the time he exited his home from the side door.  Shuler admitted he got the gun because he wanted "everybody to leave his yard."

[4] Shuler's home was on his right side, and Shuler admitted that he is not sure how he saw an object moving towards him out of his right eye when his right eye orbital was allegedly fractured.

claimed "that based on the caseload that he had," Decedent's income was $90,000 at the time of his death and that he received most of his income in cash. Wife stated she knew Decedent's caseload and income because she was often responsible for making cash deposits into his checking account. She also admitted that Decedent did not file tax returns for the year of his death but moved to admit two of his tax returns from 2007 and 2009. The master refused to admit the tax returns for the purpose of proving Decedent's income because they were incomplete and Wife failed to authenticate them. Wife further stated that she was impacted by the loss of Decedent's income because it helped pay the bills.

At trial, Shuler argued he was immune from civil action under the Act because he acted in self-defense. By order dated March 29, 2018, the master found Shuler (1) was not entitled to immunity under the Act because he failed to prove by a preponderance of the evidence that he was acting in self-defense when he shot Decedent, (2) failed to file a pretrial motion to determine immunity, and (3) Wife was entitled to an award under the wrongful death and survival statutes. The master awarded Wife $1,500,000 for the wrongful death claim and $100,000 for her survival action—totaling $1,600,000. This appeal followed.

## ISSUES ON APPEAL

I.    Did the master err in denying Shuler immunity from civil actions under the Act?

II.   Did the master err in finding Decedent's estate was entitled to a wrongful death award under section 15-51-10 of the South Carolina Code (2005)?

III.  Did the master err in finding Decedent's estate was entitled to a survival award under section 15-5-90 of the South Carolina Code (2005)?

## STANDARD OF REVIEW

"Our scope of review for a case heard by a [m]aster-in-[e]quity who enters a final judgment is the same as that for review of a case heard by a circuit court without a jury." *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989). "In an action at law, 'we will affirm the master's factual findings if there is any evidence in the record which reasonably supports them.'" *Query v. Burgess*, 371 S.C. 407, 410, 639 S.E.2d 455, 456 (Ct. App. 2006) (quoting *Lowcountry Open Land Tr. v. State*, 347 S.C. 96, 101–02, 552 S.E.2d 778, 781 (Ct. App. 2001)). Additionally, in cases tried without a jury, "questions regarding the

credibility and the weight of evidence are exclusively for the [master]." *In re Estate of Anderson*, 381 S.C. 568, 573, 674 S.E.2d 176, 179 (Ct. App. 2009) (quoting *Golini v. Bolton*, 326 S.C. 333, 342, 482 S.E.2d 784, 789 (Ct. App. 1997)).

## LAW/ANALYSIS

### I.      Immunity under the Act

Shuler argues the master erred in finding he was required to file a pretrial motion to determine if he was entitled to immunity from civil action under the Act. We disagree.

The Act codifies the common law Castle Doctrine and states the General Assembly finds it "proper for law-abiding citizens to protect themselves, their families, and others from intruders and attackers *without fear of . . . civil action . . . .*" § 16-11-420(A), (B) (emphases added). Further, the Act provides immunity from civil action for law-abiding citizens who justifiably acted in self-defense, stating, "A person who uses deadly force as permitted by the provisions of this article . . . is justified in using deadly force and *is immune from . . . civil action* for the use of deadly force . . . ." § 16-11-450(A) (emphases added).

Whether a trial court is required to determine if a party is immune under the Act before a civil trial begins is a novel issue for this court.[5] However, our supreme court has ruled that a defendant claiming immunity from criminal prosecution under the Act must establish his entitlement to this relief prior to trial. *See State v. Duncan*, 392 S.C. 404, 410, 709 S.E.2d 662, 665 (2011). We find the supreme court's ruling in *Duncan* instructive for our determination.

In *Duncan*, the court found the legislature intended to create a true immunity, not merely an affirmative defense, for law-abiding citizens who seek to invoke protection under the Act. *Id.* at 410, 709 S.E.2d at 665. Relying on the legislature's use of the words "immune from criminal prosecution" and "proper for law-abiding citizens to protect themselves[] . . . from intruders and attackers without fear of prosecution or civil action" the court found that immunity under the

---

[5] "In a case raising a novel question of law, [an appellate court] is free to decide the question with no particular deference to the lower court." *McMaster v. Columbia Bd. of Zoning Appeals*, 395 S.C. 499, 504, 719 S.E.2d 660, 662 (2011) (per curiam).

Act is an absolute bar to criminal prosecution and must be decided prior to trial. *Id.*

The Act's language is clear and unambiguous that it was the legislature's intent to extend immunity under the Act from both criminal prosecution and civil actions to law-abiding citizens who were justified in their use of deadly force. *See* § 16-11-420(B) ("The General Assembly finds that it is proper for law-abiding citizens to protect themselves, their families, and others from intruders and attackers *without fear of* prosecution or *civil action* for acting in defense of themselves and others." (emphases added)); § 16-11-450(A) ("A person who uses deadly force as permitted by the provisions of this article or another applicable provision of law is justified in using deadly force and *is immune from* criminal prosecution and *civil action* for the use of deadly force . . . ." (emphases added)). Further, based on our supreme court's interpretation of the Act in criminal proceedings, the only way immunity under the Act can be meaningfully enforced in a civil action is to require individuals seeking immunity to file a pretrial motion. *See Duncan*, 392 S.C. at 410, 709 S.E.2d at 665 ("[W]e find that, by using the words 'immune from criminal prosecution,' the legislature intended to create a true immunity, and not simply an affirmative defense."); *id.* ("We agree . . . that the legislature intended defendants be shielded from trial if they use deadly force as outlined under the Act."). Therefore, we hold the master did not err in finding Shuler was required to seek a pretrial determination of his immunity under the Act.[6] Accordingly, we affirm the master on this issue.

## II.    Wrongful Death Claim

Shuler argues the master erred in finding Decedent's estate presented sufficient evidence to support a finding of wrongful death. Specifically, Shuler argues the master erred in awarding damages because Wife failed to present any evidence substantiating Decedent's income. We disagree.

In South Carolina, the personal representative of an individual's estate may file a wrongful death claim when a person's wrongful or negligent act causes the death of a decedent and the wrongful or negligent act, had it not caused death, would have

---

[6] Because our finding is dispositive, we decline to address Shuler's contention that the master erred in determining he was not entitled to immunity under the Act. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

entitled the injured party to maintain an action to recover damages. *See* § 15-51-10; S.C. Code Ann. § 15-51-20 (2005). Wrongful death may be pursued under a theory of negligence. *See Young v. Tide Craft, Inc.*, 270 S.C. 453, 461, 242 S.E.2d 671, 675 (1978). To recover damages under a negligence theory, the plaintiff must prove (1) the tortfeasor owed the decedent a duty of care, (2) the tortfeasor breached his duty to the decedent through a negligent act, and (3) the breach proximately caused damages. *Hurst v. E. Coast Hockey League, Inc.*, 371 S.C. 33, 37, 637 S.E.2d 560, 562 (2006). In determining damages recoverable under the wrongful death statute, "the question is not one of the value of the human life lost, but is rather the damages sustained by the beneficiaries from the death." *Smith v. Wells*, 258 S.C. 316, 319, 188 S.E.2d 470, 471 (1972); *see also Zorn v. Crawford*, 252 S.C. 127, 136–37, 165 S.E.2d 640, 645 (1969) (finding the measure of damages recoverable is the injury to the beneficiaries, not the social or intrinsic value of the life of the decedent). Recoverable damages include pecuniary loss, mental shock and anguish, wounded feelings, grief and sorrow, loss of companionship, and deprivation of the use and comfort of the decedent's society. *Welch v. Epstein*, 342 S.C. 279, 304, 536 S.E.2d 408, 421 (Ct. App. 2000). When the decedent is the spouse of the beneficial plaintiff, in the absence of evidence to the contrary, pecuniary losses may be presumed from the death. *Mishoe v. Atl. Coast Line R.R. Co.*, 186 S.C. 402, 418, 197 S.E. 97, 105 (1938). However, "only such future or prospective damages may be recovered as the evidence renders it reasonably certain will of necessity result from the alleged injury." *Smith*, 258 S.C. at 319, 188 S.E.2d at 471.

We find the master did not err in concluding Decedent's estate met its burden in proving its claim for wrongful death. *See Burgess*, 371 S.C. at 410, 639 S.E.2d at 456 ("In an action at law, 'we will affirm the master's factual findings if there is any evidence in the record which reasonably supports them.'" (quoting *Lowcountry*, 347 S.C. at 101–02, 552 S.E.2d at 781)). The record shows that Shuler and Decedent had a physical altercation caused by Shuler slapping Decedent several times. Testimony also revealed that Decedent was attempting to leave Shuler's home when Shuler exited the house, walked towards the front of his house, and fired his handgun at an "image coming towards [him]." Shuler admitted he was unaware of who or what he was shooting, and it is undisputed that Decedent's gunshot wound was the proximate cause of his death.

Further, we find the master did not err in awarding $1,500,000 to Decedent under the theory of wrongful death. "[W]here the amount of the verdict falls within the range of damages testified to, the verdict cannot be disturbed on the ground of excessiveness." *Gastineau v. Murphy*, 323 S.C. 168, 183, 473 S.E.2d 819, 828 (Ct.

App. 1996) (alteration in original) (quoting *Buzhardt v. Cromer*, 272 S.C. 159, 163, 249 S.E.2d 898, 900 (1978)), *rev'd on other grounds*, 331 S.C. 565, 503 S.E.2d 712 (1998).  Wife testified Decedent earned $90,000 per year as a bail bondsman and longshoreman but acknowledged Decedent was often paid in cash.  Wife stated she was personally aware of Decedent's income because she often made cash deposits of Decedent's earnings into his bank account.  In addition, she was aware of his caseload at the time of his death.  Ultimately, the master awarded Decedent's estate $203,251.25 in medical expenses and found "the decedent would have earned $50,000 per year for the remainder of his work life which would amount to $1,250,000 before reducing to present value."  The master's award of $50,000 per year falls within the range of evidence presented by Decedent's estate. *Compare id. and Ravan v. Greenville County*, 315 S.C. 447, 456, 434 S.E.2d 296, 302 (1993) (noting the damages award was within the range of conflicting testimony at trial and affirming the trial court's denial of the motion for a new trial on the basis of excessive damages) *with Sparrow v. Toyota of Florence*, 302 S.C. 418, 422, 396 S.E.2d 645, 647–48 (Ct. App. 1990) (finding a new trial was required when the jury awarded plaintiff damages but plaintiff presented no evidence relevant to the measure of damages).  Accordingly, we affirm the master on this issue. *See Burgess*, 371 S.C. at 410, 639 S.E.2d at 456 ("In an action at law, 'we will affirm the master's factual findings if there is any evidence in the record which reasonably supports them.'" (quoting *Lowcountry*, 347 S.C. at 101–02, 552 S.E.2d at 781)); *see also Anderson*, 381 S.C. at 573, 674 S.E.2d at 179 (stating that credibility and weight of evidence are exclusively for the master).

## III.   Survival Action

Shuler argues the master erred in finding Decedent's estate presented sufficient evidence to support a survival action under the conscious pain and suffering theory.  We disagree.

In South Carolina, a cause of action for injuries to an individual survive that individual's death, and damages are recoverable by the legal representative of the decedent's estate.  § 15-5-90.  Under the statute, a decedent's personal representative can recover for the decedent's "conscious pain and suffering," but there must be sufficient proof that the decedent was conscious and simultaneously suffering prior to death. *Smalls v. S.C. Dep't of Educ.*, 339 S.C. 208, 216, 528 S.E.2d 682, 686 (Ct. App. 2000).

In *Croft v. Hall*, our supreme court found sufficient evidence existed for a jury to find a decedent consciously suffered prior to death.  208 S.C. 187, 193–95, 37

S.E.2d 537, 539–40 (1946). Despite testimony from doctors and nurses that decedent was unconscious, the court found evidence that the decedent talked, "made terrible noises," moved a hand and leg in her hospital bed, and opened her eyes in response to her mother's voice was sufficient to find conscious pain and suffering. *Id.* Further, in *Smalls*, the decedent's father testified his daughter was unconscious at the accident scene and she never regained consciousness. *Small*, 339 S.C. at 216–17, 528 S.E.2d at 686. However, he also stated his daughter was gasping for air and moaning at the accident scene and he thought she could hear him and respond to his voice before her death. *Id.* at 217, 528 S.E.2d at 686–87. Notwithstanding the father's contradictions, the court ruled that reasonable evidence existed for a jury to find conscious pain and suffering. *Id.* at 217, 528 S.E.2d at 687.

We find sufficient evidence existed for the master to reasonably conclude Decedent consciously suffered pain prior to his death for a short period of time. *See id.* at 216, 528 S.E.2d at 686 (noting a scintilla of evidence was sufficient to submit conscious pain and suffering to the factfinder). To support this finding, the master referenced testimony from Morris that immediately following the shooting, she saw Decedent lying on the ground in severe pain yelling "help me" before seeing his eyes roll back into his head. *See id.* at 217, 528 S.E.2d at 686–87 (finding testimony that a decedent was gasping for air, moaning, and could possibly hear her father's voice sufficient evidence to support a jury finding conscious pain and suffering). Because the record contains sufficient evidence to reasonably support the master's finding of conscious pain and suffering, we affirm on this issue. *See Burgess*, 371 S.C. at 410, 639 S.E.2d at 456 ("In an action at law, 'we will affirm the master's factual findings if there is any evidence in the record which reasonably supports them.'" (quoting *Lowcountry*, 347 S.C. at 101–02, 552 S.E.2d at 781)).

**CONCLUSION**

Based on the foregoing, the master's order is

**AFFIRMED**.

**THOMAS and HILL, JJ., concur.**