**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(D)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Rebecca Turisk, Appellant,

v.

Dennis K. Schimpf, M.D. and Sweetgrass Plastic Surgery, LLC, Respondents.

Appellate Case No. 2023-000029

———

Appeal from Charleston County
Maite Murphy, Circuit Court Judge

———

Unpublished Opinion No. 2025-UP-349
Heard April 10, 2025 – Filed October 15, 2025

———

**AFFIRMED**

———

Mark C. Tanenbaum and Whitney Allison Smith Rogers, both of Mark C. Tanenbaum, PA, of Mt. Pleasant; Elizabeth Middleton Burke, Misty Black O'Neal, and Theodore Augustus Constantine Hargrove, II, all of Rogers, Patrick, Westbrook & Brickman, LLC, of Mount Pleasant; Jesse Sanchez, of The Law Office of Jesse Sanchez, LLC, of Mount Pleasant; and William Tyler Robinson, of Ty Robinson Law Firm, LLC, of Charleston, all for Appellant.

Todd W. Smyth and Allie Aleece Maples, both of Smyth Whitley, LLC, of Charleston, for Respondents.

------

**PER CURIAM:**  In this medical malpractice action, Appellant Rebecca Turisk assigns error to the trial court charging the jury on assumption of risk.  Turisk also appeals the trial court's denial of her motion for a new trial or in the alternative, a judgment notwithstanding the verdict (JNOV) because (1) the verdict as to proximate cause was contrary to the weight of the evidence, (2) Turisk's criticism of Respondent Dr. Dennis K. Schimpf's postoperative care did not amount to a second distinct theory of liability, and (3) the jury's verdict was inconsistent and demonstrates the jury was confused.  We affirm.

## FACTS/PROCEDURAL HISTORY

Turisk commenced the underlying medical malpractice action against Respondents,[1] alleging Dr. Schimpf selected a contraindicated surgical technique for her breast reduction and implant removal surgery, which resulted in necrosis, infection, and ultimately a double mastectomy and reconstructive surgeries.  Specifically, Turisk alleged the technique Dr. Schimpf used was contraindicated for her surgery because it failed to account for existing scar tissue below each nipple, which limited blood flow to the nipple-areolar complex (NAC).

On November 1, 2016, Dr. Schimpf performed an implant removal, breast reduction, and breast lift on Turisk using the "inferior pedicle" technique.[2]  In the first three weeks following surgery, Turisk testified she experienced fevers, noticed drainage and odor from her breasts, and that her incision opened.  The patient notes from those weeks provided that Turisk's right NAC was very bruised and that an eschar (hardened dead tissue over a deep wound) had formed, but there was no discharge, warmth, or redness.  Eventually, Turisk went to the emergency room when the incision opened on her right breast.  Turisk received IV antibiotics and was sent home to follow-up at Sweetgrass.  The patient note from the following day

------

[1] Sweetgrass Plastic Surgery, LLC, and Dennis K. Schimpf, MD are Respondents. Dr. Schimpf owns Sweetgrass Plastic Surgery, and Turisk was seen and treated by Dr. Schimpf and other Sweetgrass Plastic Surgery employees.

[2] During the breast reduction surgery, most of the tissue surrounding the NAC is removed.  The surgeon leaves a strip of tissue, the "pedicle", to maintain blood supply to the NAC.  An inferior pedicle goes downward from the NAC to the bottom of the breast.

indicated that the right incision had closed, and Dr. Schimpf "prophylactically" prescribed a round of antibiotics. Dr. Schimpf debrided[3] the tissue on the right NAC and noted an odor coming from the surrounding underlying tissue, "which was open and draining," but he did not notice any internal spread of infection. Dr. Schimpf prescribed a solution to control odor and "clean up" the region.

On December 3, Turisk entered inpatient care at the Medical University of South Carolina (MUSC) and remained there for five days. Turisk had developed an infection, fat necrosis,[4] and an open wound on her right NAC. Unfortunately, the breast tissue could not be saved, resulting in Turisk having to undergo a double mastectomy and five reconstructive surgeries.

Turisk brought the underlying action against Respondents. Turisk's expert witness, Dr. Charles Hultman, testified he believed Dr. Schimpf breached the standard of care by using a contraindicated surgical technique. In his opinion, the inferior pedicle technique compromised blood supply to the NAC and part of the breast because the tissue preserved to maintain blood flow—the pedicle—directed blood through Turisk's existing scars and blood could not pass through scar tissue. Dr. Hultman opined the inferior pedicle technique would be "extremely rare" in cases involving scar tissue like Turisk's because it would be "a dangerous operation . . . that would have a high chance of failure." Dr. Hultman described other techniques that could have "greatly improve[d] the safety of the operation and [ensured] success." However, Dr. Hultman acknowledged on cross-examination that "a patient can experience fat necrosis and nipple loss even when the surgeon has done everything according to the standard of care" and that necrosis can occur regardless of where the incisions were made. Finally, Dr. Hultman testified that he did not believe any of Turisk's actions caused or accelerated the infection.

Dr. Schimpf then offered Dr. Todd Lefkowitz as an expert in plastic surgery. Dr. Lefkowitz testified that, in his opinion, Turisk's scars did not render the inferior pedicle technique a contraindicated choice because blood could flow through the scars. Dr. Lefkowitz further testified that Dr. Schimpf cut a larger pedicle than is standard to accommodate for the scar tissue and to ensure sufficient blood flow to the NAC. Dr. Lefkowitz conceded there was some disruption to the blood flow during surgery because fat necrosis would not have occurred absent some disruption;

---

[3] Debridement cleans the area of nonviable tissue to allow a wound to heal.

[4] Fat necrosis occurs when inadequate blood flow into or return from fatty tissue causes the tissue to die and release oil that metabolizes into a caustic alcohol, which can damage surrounding tissue.

however, he did not believe the use of the inferior pedicle technique as opposed to another technique caused the disruption. Dr. Lefkowitz further testified that known risks and complications of this surgery include loss of the NAC, infection, and the need for further, more complex surgery. Lastly, Dr. Lefkowitz agreed with other witnesses that Turisk did nothing to cause the infection or necrosis. All the experts testified to a reasonable degree of medical certainty.

The jury returned a verdict in favor of Respondents, finding that Turisk proved by the preponderance of the evidence that Respondents deviated from the standard of care but failed to prove this deviation from the standard of care proximately caused Turisk's injuries. Turisk filed a post-trial motion for a new trial as to proximate cause and damages, or in the alternative, either a JNOV or a new trial absolute. The trial court denied the motion. This appeal followed.

## LAW/ANALYSIS

### I. Assumption of Risk Jury Instructions

Turisk argues the trial court erred in charging the jury on assumption of risk because a patient cannot assume the risk that a physician will deviate from the standard of care, and because assumption of risk goes to duty and there was no question a duty existed as a matter of law. Turisk further argues the charge was prejudicial because it confused the jury. We hold the charge was erroneous but not prejudicial.

"A jury charge consisting of irrelevant and inapplicable principles may confuse the jury and constitutes reversible error where the jury[']s confusion affects the outcome of the trial." *Cole v. Raut*, 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008). "An appellate court will not reverse the trial court's decision regarding jury instructions unless the trial court committed an abuse of discretion. An abuse of discretion occurs when the trial court's ruling is based on an error of law or is not supported by the evidence." *Id.* (citation omitted). "An erroneous jury instruction . . . is not grounds for reversal unless the appellant can show prejudice from the erroneous instruction." *Id.* at 405, 663 S.E.2d at 33.

"Primary implied assumption of risk arises when the plaintiff impliedly assumes those risks that are *inherent* in a particular activity." *Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 333 S.C. 71, 81, 508 S.E.2d 565, 570 (1998). "Primary implied assumption of risk is not a true affirmative defense[] but instead goes to the initial determination of whether the defendant's legal duty

encompasses the risk encountered by the plaintiff." *Id*.; *see also* Restatement (Second) of Torts § 496A cmt. (c)(2) (1965) (stating that under implied assumption of risk, "the legal result is that the defendant is relieved of his duty to the plaintiff").

> In its primary sense, implied assumption of risk focuses not on the plaintiff[']s conduct in assuming the risk, but on the *defendant's general duty of care* . . . . Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case [of negligence] by failing to establish that a duty exists.

*Davenport*, 333 S.C. at 81, 508 S.E.2d at 570 (emphasis added) (quoting *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994)). Primary assumption of risk is "really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 496–97 (5th ed. 1984). In essence, defendants do not owe plaintiffs a duty of due care regarding common and known inherent risks—the classic example being that a baseball stadium owes no duty to plaintiffs injured by flying baseballs. *Cf. Hurst v. E. Coast Hockey League, Inc.*, 371 S.C. 33, 38, 637 S.E.2d 560, 562–63 (2006) ("Under the doctrine of implied primary assumption of risk, Respondents' duty of care did not encompass the risk involved. The risk of a hockey spectator being struck by a flying puck is inherent to the game of hockey and is also a common, expected, and frequent risk of hockey."); *Cole v. Boy Scouts of Am.*, 397 S.C. 247, 253, 725 S.E.2d 476, 479 (2011) ("Where a person chooses to participate in a contact sport, whatever the level of play, he assumes the risks inherent in that sport.").

Before surgery, Turisk signed a consent form acknowledging that "[a]lternative methods and therapies, their benefits, material risks and disadvantages" had been explained to her; she understood and accepted that the most likely risks and complications included infection and nipple/skin loss, among others; and she had been informed of the possible need for additional procedures postoperatively.

The trial court instructed the jury on the elements of assumption of risk and explained that:

> In this case, [Respondents] contend[] that [primary] implied assumption of the risk applies. Primary implied assumption of risk arises when the plaintiff impliedly

assumes those risks that are inherent in a particular activity.

Primary implied assumption of the risk is not a trial affirmative defense, but instead goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff. In other words, it is simply a part of the initial negligence analysis.

In addition to its assumption of risk instruction, the trial court instructed the jury that: "despite [informed consent to a medical procedure], the defendant remains under a duty to comply with and meet the standard of care in choosing a surgical technique and performing that technique."

We hold the trial court erred in charging the jury as to assumption of risk because it was inapplicable to the facts of this case and risked confusing the jury. *Cole v. Raut*, 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008) ("A jury charge consisting of irrelevant and inapplicable principles may confuse the jury and constitutes reversible error where the jury[']s confusion affects the outcome of the trial."). Surgery is an inherently risky endeavor, and we recognize that patients may assume some risk when they agree to undergo surgery. In fact, our precedent does evidence that patients assume the risk of their chosen method of treatment—i.e., by electing to undergo surgery as opposed to another form of treatment. *See Faile v. Bycura*, 289 S.C. 398, 399, 346 S.E.2d 528, 529–30 (1986) ("When a patient seeks treatment by a particular type of practitioner, he may be held to have assumed the risk of the *method* of treatment of the particular school of thought chosen." (emphasis added)). However, the existence of a surgery's known inherent risks does not alter the physician's duty to exercise reasonable care, and the exercise of reasonable care includes selecting an appropriate surgical technique. *See Hoeffner v. The Citadel*, 311 S.C. 361, 368, 429 S.E.2d 190, 194 (1993) ("Reasonable care, in the context of professional negligence, requires the exercise of that degree of skill and care which is ordinarily employed by members of the profession under similar conditions and in like surrounding circumstances."); *Cole v. Raut*, 378 S.C. 398, 405, 663 S.E.2d 30, 33 (2008) (holding that though a patient consented to a vaginal birth after caesarian section procedure, the patient "did not simultaneously assume the risk of any danger specifically associated with a delayed C-section delivery").

Turisk claimed Dr. Schimpf violated the standard of care by selecting a contraindicated technique, a risk she neither consented to nor understood and appreciated. Turisk at no point consented to the risks associated with negligent

surgery. Keeton et al., *supra* § 68, at 485 ("It is not true that in any case where the plaintiff voluntarily encounters a known danger he necessarily consents to any future negligence of the defendant."). There is no testimony or indication that Turisk was aware of the different techniques Dr. Schimpf could have used to perform her surgery, nor is there any evidence that she consented to a particular technique. Moreover, even if she had consented to Dr. Schimpf's use of the inferior pedicle technique, there is no evidence that she fully understood and appreciated the risks of this technique compared to any other. *See Faile*, 289 S.C. at 399, 346 S.E.2d at 529 ("In order for the doctrine of assumption of the risk to apply, the injured party must have freely and voluntarily exposed himself to a known danger which he *understood and appreciated*." (emphasis added))[5]; Keeton et al., *supra* § 68, at 487 ("[The plaintiff] must not only know of the facts which create the danger, but he must comprehend and appreciate the nature of the danger he confronts."). Turisk's decision to undergo surgery and consent to the inherent risks did not relieve Dr. Schimpf of his duty to select an appropriate technique and perform the surgery with due care. Thus, primary implied assumption of risk did not apply in this case and the trial court erred in charging the jury as to assumption of risk.

However, though the trial court erred in charging the jury on assumption of risk, we hold the erroneous instruction was not prejudicial because it did not affect

---

[5] *Faile* and *Cole v. Raut* were decided under a prior framework when assumption of risk was an affirmative defense. Following the adoption of comparative negligence, *see generally*, *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 399 S.E.2d 783 (1991); our supreme court had to reconcile the assumption of risk doctrine with comparative negligence. *Davenport*, 333 S.C. at 77, 508 S.E.2d at 568. ("*Nelson* made clear that a plaintiff's contributory negligence would no longer bar recovery unless such negligence exceeded that of the defendant. Not so clear was what would become of the defense of assumption of risk."). The court held express assumption of risk and primary implied assumption of risk are compatible with comparative negligence because they go to whether the defendant has a legal duty to the plaintiff. *Id.* at 79–82, 508 S.E.2d at 569–71. However, the court held secondary implied assumption of risk—which "arises when the plaintiff knowingly encounter[ed] a risk created by the defendant's negligence"—is *not* compatible with comparative negligence because it is "an absolute bar to recovery" and "may involve either reasonable or unreasonable conduct on the part of the plaintiff." *Id.* at 82, 87, 508 S.E.2d at 571, 573. Thus, because secondary assumption of risk may "require a plaintiff, who is fifty-percent or less at fault, to bear all of the costs of the injury," the court held it was "contrary to the premise of our comparative fault system." *Id.* at 86, 508 S.E.2d at 573.

the outcome of the trial. *See Cole v. Raut*, 378 S.C. 398, 405, 663 S.E.2d 30, 33 (2008) ("An erroneous jury instruction, however, is not grounds for reversal unless the appellant can show prejudice from the erroneous instruction."). The jury ultimately found that Dr. Schimpf's actions, although a deviation from the standard of care, did not proximately cause Turisk's injuries. Even without the assumption of risk instruction, the outcome would not change because, as the circuit court instructed the jury, assumption of risk contemplates whether a defendant's duty encompasses a particular risk. Inherent to the jury's finding that Dr. Schimpf breached the standard of care is a finding that Dr. Schimpf was *not* relieved of his duty of care to Turisk with regard to selecting a surgical technique and providing adequate postoperative care. *See Cole v. S.C. Elec. & Gas, Inc.*, 362 S.C. 445, 453, 608 S.E.2d 859, 863 (2005) ("Primary implied assumption of the risk arises when the plaintiff impliedly assumes risks inherent in a particular activity. It is not a true affirmative defense but is another way of stating there is no duty to the plaintiff." (citation omitted)). The jury may only reach proximate cause once the existence of a duty, the standard of care, and a breach of that standard have already been established. By reaching proximate cause, the jury rejected the theory that Turisk assumed the risk of her injuries. As discussed herein, the jury—within its purview and consistent with the evidence presented—did not find that the breach of the standard of care proximately caused the unfortunate injury in this case.

Accordingly, we hold that the trial court erred in charging the jury on assumption of risk but the error did not prejudice Turisk.

## II. Post-trial Motion

Turisk asserts the trial court erred in denying her post-trial motion for a new trial or JNOV because all experts agreed that but for a disruption of blood supply to the NAC, Turisk would not have suffered her injuries, and all experts agreed that necrosis and infection were the natural and probable consequences of a disruption of blood supply. Turisk contends the evidence was susceptible to only one inference—a disruption to the NAC's blood supply resulted from the inferior pedicle technique that caused infection and necrosis. Turisk also argues that the jury's findings were inconsistent and demonstrated that the jury was confused because (1) the verdict was wholly unsupported by the evidence and (2) the assumption of risk charge was improper. Turisk notes the trial court compounded the error by relying on the assumption of risk doctrine in its order. We disagree.

"When reviewing the trial court's ruling on a motion for a directed verdict or a JNOV, this [c]ourt must apply the same standard as the trial court by viewing the

evidence and all reasonable inferences in the light most favorable to the nonmoving party." *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331–32, 732 S.E.2d 166, 171 (2012). "The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt." *Id.* at 332, 732 S.E.2d at 171. "Moreover, '[a] motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict.'" *Id.* (alteration in original) (quoting *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998)). "An appellate court will reverse the trial court's ruling only if no evidence supports the ruling below." *Id.* "In deciding such motions, neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." *Id.*

"Whether to grant a new trial is a matter within the discretion of the trial judge, and this decision will not be disturbed on appeal unless it is unsupported by the evidence or is controlled by an error of law." *Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 49, 691 S.E.2d 135, 149 (2010). "Verdicts which are irreconcilably inconsistent should not stand, and a new trial should be granted, because the parties and the judge 'should not be required to guess as to what a jury sought to render.'" *Id.* (quoting *Prego v. Hobart*, 287 S.C. 116, 118, 336 S.E.2d 725, 726 (Ct. App. 1985)). "However, '[i]t is the duty of the court to sustain verdicts when a logical reason for reconciling them can be found.'" *Id.* at 49–50, 691 S.E.2d at 149 (alteration in original) (quoting *Rhodes v. Winn-Dixie Greenville, Inc.*, 249 S.C. 526, 530, 155 S.E.2d 308, 310 (1967)).

To succeed in a medical malpractice action, the plaintiff must establish (1) there was a doctor-patient relationship between the parties; (2) the health professional deviated from "generally accepted standards, practices, and procedures;" and (3) the deviation was the proximate cause of the plaintiff's injury. *Brouwer v. Sisters of Charity Providence Hosps.*, 409 S.C. 514, 521, 763 S.E.2d 200, 203 (2014).

"Proximate cause requires proof of both causation in fact and legal cause." *Hurd v. Williamsburg County*, 353 S.C. 596, 611, 579 S.E.2d 136, 144 (Ct. App. 2003), *aff'd*, 363 S.C. 421, 611 S.E.2d 488 (2005). "Causation in fact is proved by establishing the plaintiff's injury would not have occurred 'but for' the defendant's negligence." *Id.* "Legal cause, in contrast to the 'but for' nature of causation in fact, is proved by establishing foreseeability. *Id.* "The standard by which foreseeability is determined is that of looking to the natural and probable consequences of the complained of act." *Id.* at 612, 579 S.E.2d at 144. "[I]f the accident would have happened as a natural and probable consequence, even in the absence of the alleged

breach, then a plaintiff has failed to demonstrate proximate cause." *Id.* "When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence." *Turner v. Med. Univ. of S.C.*, 430 S.C. 569, 586–87, 846 S.E.2d 1, 10 (Ct. App. 2020) (quoting *McKaughan v. Upstate Lung & Critical Care Specialists, P.C.*, 421 S.C. 185, 190, 805 S.E.2d 212, 214 (Ct. App. 2017)).

Here, the trial court did not err in denying the post-trial motion because the evidence presented to the jury was susceptible to more than one inference. *See RFT Mgmt. Co.*, 399 S.C. at 332, 732 S.E.2d at 171 ("An appellate court will reverse the trial court's ruling only if no evidence supports the ruling below. In deciding such motions, neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." (citation omitted)). All the experts agreed that fat necrosis was caused by inadequate blood flow into the NAC, which can occur as a natural consequence of this surgery regardless of the technique used. But to satisfy the element of causation, Turisk was required to prove that Dr. Schimpf's *breach* caused the blood flow disruption that resulted in fat necrosis. Because the alleged breach was the selection of a contraindicated technique, Turisk had to prove that using an inferior pedicle elevated the risk of blood flow disruption so much that this outcome was foreseeable. *Hurd*, 353 S.C. at 611, 579 S.E.2d at 144 ("Proximate cause requires proof of both causation in fact and legal cause.").

The jury was presented with conflicting evidence as to causation. Dr. Hultman testified it would be "extremely rare" to use the inferior pedicle technique on a patient like Turisk because of "the knowledge ahead of time that there were serious risks to the nipple and to the breast tissues." On the other hand, Dr. Lefkowitz testified that even if "not a drop of blood got through the scar," Dr. Schimpf mitigated any increased risk of blood flow disruption by cutting a larger-than-standard pedicle. Thus, there was credible evidence to support the jury's conclusion that the blood flow disruption was not caused by Dr. Schimpf's use of an inferior pedicle. Therefore, the trial court did not err in denying Turisk's post-trial motion because evidence supports the jury's finding that, to the extent Dr. Schimpf breached the standard of care in his treatment of Turisk, the breach did not cause Turisk's injuries. *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) ("In considering a JNOV, the trial judge is concerned with the existence of evidence, not its weight. When considering a JNOV, 'neither [an appellate] court, nor the trial court has authority to decide credibility issues or to resolve conflicts in

the testimony or the evidence.'" (alteration in original) (quoting *Reiland v. Southland Equip. Serv., Inc.*, 330 S.C. 617, 500 S.E.2d 145 (Ct. App. 1998))); *Geiger v. Checker Cab Co.*, 229 S.C. 39, 43, 91 S.E.2d 552, 554 (1956) ("The credibility of witnesses is peculiarly within the province of the jury.").

Further, the trial court did not err in finding that the jury's verdict was consistent because the intention of the jury's verdict was clear—Dr. Schimpf breached a duty of care he owed Turisk by selecting a contraindicated technique, but this breach did not cause the damages she suffered. *Daves v. Cleary*, 355 S.C. 216, 234, 584 S.E.2d 423, 432 (Ct. App. 2003) ("A jury's verdict should be affirmed if it is possible to do so and carry into effect the jury's clear intention."); *Austin*, 387 S.C. at 49, 691 S.E.2d at 149 ("Verdicts which are irreconcilably inconsistent should not stand, and a new trial should be granted, because the parties and the judge 'should not be required to guess as to what a jury sought to render.'" (quoting *Prego*, 287 S.C. at 118, 336 S.E.2d at 726)); *id.* at 49–50, 691 S.E.2d at 149 ("However, '[i]t is the duty of the court to sustain verdicts when a logical reason for reconciling them can be found.'" (alteration in original) (quoting *Rhodes*, 249 S.C. at 530, 155 S.E.2d at 310)); *see Vinson v. Hartley*, 324 S.C. 389, 411–12, 477 S.E.2d 715, 726–27 (Ct. App. 1996) (upholding a jury verdict finding the defendant did not proximately cause the plaintiff's injuries despite the defendant conceding she had breached her duty of care to the plaintiff).

Accordingly, we affirm the trial court's denial of Turisk's post-trial motion.

## CONCLUSION

For the foregoing reasons, we hold the trial court erred in charging the jury on assumption of risk but the error did not prejudice Turisk, and we affirm the trial court's denial of Turisk's post-trial motion.

**WILLIAMS, C.J., and GEATHERS and TURNER, JJ., concur.**